THE STATE OF MISSOURI, Defendant in Error, *v.* GEORGE SLOAN, Plaintiff in Error.

1. *Criminal law — Homicide — Indictment — Threats and admissions of deceased, when admissible as res gestæ.*—In the trial of an indictment for murder, threats by the deceased against defendant, which were frequent and continuous down to the time of killing, and all blended together and inseparable, would be considered as a part of the *res gestæ,* and evidence touching them would be admissible to explain the act and show whether defendant acted in necessary self-defense. And testimony of the deceased, immediately after the tragedy, exculpating defendant, would be admissible on the same principle.

2. *Homicide — Killing on apprehension of bodily harm.*—Where one apprehends great bodily harm from another and there is reasonable ground to believe that such harm is imminent, he may safely act on appearances, and even kill the assailant if necessary to avoid the danger. And the killing would be justifiable, though it afterward turn out that the appearances were false — that there was, in fact, neither design to do him serious injury nor danger that it would be done. But he must decide at his peril on the force of the circumstances in which he is placed, for that is a matter which will be subject to judicial review.

3. *Manslaughter, instruction as to.*—Under indictment for murder, an instruction that defendant may be convicted of manslaughter should define the latter crime.

4. *Criminal law — Manslaughter in first degree implies something more than intentional violence.*—In order to bring a case within the definition of manslaughter in the first degree, it is necessary to show that defendant was committing or attempting to commit some other offense than that of intentional violence upon the person killed.

*S. M. Chapman,* for plaintiff in error.

I. It was error to exclude evidence of Moore's threats and conduct before the affray, and in holding that all threats and demonstrations made by him more than three days before the affray were too stale to be given in evidence, although communicated before the shooting; and that all such as had not been communicated were inadmissible, however recent. (Campbell v. People, 16 Ill. 17; Dukes v. State, 11 Ind. 557; Cornelius v. Commonwealth, 15 B. Monr. 539; Howell v. State, 5 Ga. 54–5; Keener v. State, 18 Ga. 224–9; Lingo v. State, 29 Ga. 484; Stewart v. State, 19 Ohio, 306; Pitman v. State, 22 Ark. 356, and cases cited; Dupree v. State, 33 Ala. 380; Howell v. State,

5 Ga. 54 ; Monroe v. State, 5 Ga. 85, 121 ; Cornelius v. Commonwealth, 15 B. Monr. 539 ; Roscoe's Crim. Ev., 6th ed., 710.) The cases of The State v. Jackson, 17 Mo. 544, and State v. Hays, 23 Mo. 287, are not in point.

II. Defendant had tried to avoid his adversary, but all to no purpose ; and when he saw the danger imminent, he was justified in acting more promptly in his defense, and upon less demonstrations of hostility, than though his fears had not been aroused by Moore's threats and prior conduct. (State v. Hicks, 27 Mo. 588 ; People v. Rector, 19 Wend. 569 ; Selfridge's Trial, 160 ; Phillips v. Commonwealth, 2 Duvall, 328 ; Pattison v. People, 46 Barb. 625 ; Granger v. State, 5 Yerg. 459 ; 1 Bish. Crim. Law, § 384 ; Young v. Commonwealth, 6 W. P. D. Bush, 312 ; Campbell v. People, *supra;* 2 Whart. Crim. Law, 4th ed., § 1027, note ; Howell v. Commonwealth, 2 Duvall, Ky., 228.)

III. The court should have admitted evidence of Moore's declarations to his surgeons, while engaged in extracting the ball and dressing the wound, made immediately after the affray, " that Sloan was not in fault, that he had drawn on the difficulty by attacking him," as part of the *res gestæ.* (Commonwealth v. McPike, 3 Cush., Mass., 181 ; King v. Foster, 6 Car. & P. 325 ; Aveson v. Kinnaird, 6 East, 197; Travelers' Ins. Co. v. Mosley, 8 Wall. 397 ; Rawson v. Hugh, 2 Bing. 104 ; Starkie's Ev., Sharswood's ed., 89 ; People v. Durant, 13 Mich. 351 ; Marr v. Hill, 10 Mo. 320 ; Walde v. Perryman, 27 Mo. 279 ; Hanover R.R. Co. v. Coyle, 55 Penn. 396.)

IV. 1. The court erred in instructing the jury upon the law of manslaughter in the first degree, there being in the case no evidence tending to show the defendant guilty of that offense. (Franz v. Hilderbrand, 45 Mo. 121 ; Webster College v. Taylor, 35 Mo. 268 ; Harper v. Indianapolis & St. Louis R.R. Co., 44 Mo. 488 ; State v. Rose, 32 Mo. 346.) It was the duty of the court to declare the law as applicable to the grade or grades of homicide which the evidence tended to prove, and to have confined its instructions to such grade or grades. (State v. Rose, 32 Mo. 346 ; State v. Jones, 20 Mo. 58, 64 ; State v. Dunn, 18 Mo. 419 ; State v. Jecko, 44 Mo. 234, 236.) 2. The court should,

after instructing the jury that they could convict for manslaughter in the first degree, have declared the law defining that offense, as requested by the defendant, that "manslaughter in the first degree, as applicable to this case, is where the killing is without a design to effect death, by the act, procurement or culpable negligence of the defendant while engaged in the perpetration or attempt to perpetrate a crime less than a felony." It is said by the court in Crawford v. State, 12 Ga. 142: "Whenever there is any doubt as to the grade of the offense, it is the duty of the court clearly and distinctly to instruct the jury as to the law defining the several grades of homicide, and then to leave them to find from the evidence of which particular grade the defendant is guilty." (See Davis v. State, 10 Ga. 109.) The jury was, in this case, in substance, instructed that they could convict for manslaughter in the first degree; but an instruction asked by the defendant defining that offense was refused. This was error. This instruction, which was asked by the defendant to meet the effect of the one given for the State, embodied a correct exposition of the law of manslaughter in the first degree, as applicable to the facts of this case, and should have been given, so far as it related to that offense, whatever may be thought as to the technical accuracy of some other portions of the instruction. 3. The court should have instructed the jury as asked by the defendant upon the law of self-defense and justifiable homicide. Upon the law defining justifiable homicide the defendant requested the court to declare that "homicide is deemed justifiable when committed in resisting an attempt to kill such person, or when committed in his or her lawful defense, when there shall be reasonable cause to apprehend a design to do him or her some great personal injury, and there shall be reasonable cause to apprehend immediate danger of such design being accomplished. And in deciding the degree of homicide to be imputed to the defendant, and whether he had or had not reasonable cause to apprehend such immediate danger to exist at the time of shooting, all the circumstances connected with the shooting, together with the conduct and situation of the deceased at the time, and immediately prior thereto, are proper subjects for the consideration of the jury."

(See Wagn. Stat. 446, § 4.) This instruction was important to have enabled the jury to determine whether the homicide for which the accused was on trial was not by the evidence brought within the pale of justifiable homicide, and should have been given, although some of the language used may not have been the most appropriate or happy.

*Leonard*, for defendant in error.

WAGNER, Judge, delivered the opinion of the court.

The defendant was indicted in the Circuit Court of Dunklin county for the murder of one Charles A. Moore. The indictment was in the usual form for murder in the first degree, and a change of venue having been awarded to Cape Girardeau county, a trial was there had, and he was convicted of manslaughter in the first degree.

The exclusion of evidence offered by the defendant, the giving and refusing of instructions and the finding of the jury are the matters complained of.

The evidence shows that Moore, the deceased, entertained the greatest ill-feeling toward the defendant, whom he accused of slandering him ; that he had made threats on various occasions that he would kill him ; that he commenced to make these threats some weeks before, and continued to make them to within less than an hour of being shot, when he stated, while belting on his pistol and going in the direction of the defendant, that he " was going to kill George Sloan." At the time of the killing the defendant had just come to town, and Moore immediately sought him out, and got into an altercation with him ; the defendant started to leave, and Moore followed him with his revolver buckled on his person ; defendant then turned round, saying to Moore, " don't follow me," and immediately fired the shot from the effects of which Moore died in a few days thereafter.

The court rejected all the evidence of threats made by the deceased more than three days previous to the shooting as being too stale and remote, and also refused to admit in evidence those threats which had been made just prior to the killing, and which had not at that time been communicated to the defendant. What

length of time must elapse after threats are made, and under what circumstances they are to be received in evidence, is not very definitely fixed or clearly settled.

In The State v. Jackson, 17 Mo. 544, it was held that evidence of threats was not admissible if sufficient time had elapsed for the blood to cool. But that case is so entirely different in its features from this that it can be regarded as of very little authority here.

In the case of The State v. Hays, 23 Mo. 287, it appeared from all the evidence that the prisoner was the aggressor, and had sought the difficulty in which the deceased was killed. This court refused to reverse the judgment of conviction for murder, because the court below rejected evidence of threats made by the deceased against the prisoner, the records not showing whether the threats were recent or of long standing.

Of the propriety and justice of the decision upon the facts as developed in that case, there can be no doubt. At what time the threats were made did not appear, and the murdered man was not trying to execute his threats, or commit any offense, when the prisoner met and killed him. A threat antecedently made would of course furnish no justification or palliation for a homicide under such circumstances. The books contain examples in which the threats of the deceased party have been given in evidence, and there are also cases in which such threats have been rejected. But where such threats have been received they were generally recent, or continued down, so as to become very nearly coeval with the killing, and were brought home to the knowledge of the party slaying. (See Levin's C. C. 184; Rosc. Crim. Ev. 772; Rector's case, 19 Wend. 569.) But the judge who delivered the opinion of the court in Hays' case distinguishes it from that class of cases where the threats are made and continued down to the time of the killing. Thus, in speaking of the case of Monroe v. State, 5 Ga. 85, 135, 136, he says: "In the case of Monroe v. State of Georgia, the facts were widely different from the facts in this case. There the threats against the life of Monroe, coupled with the acts of Macon, were brought down to the time of killing. The deceased, at his death, was armed with a yaeger

and two pistols; he had been watching and seeking the opportunity to kill Monroe. He had created such a dread of losing life in Monroe's mind that, although a physician, he was compelled to practice his profession by visiting his patients in the night-time. Here the threats by Macon against Monroe and the acts of Macon, of one continued hostile series down to the death, were important evidence to explain the killing on the part of Monroe. In the case from Georgia, Meade's case and Rector's case are quoted and relied on as authority. This kind of evidence is permitted by the court in Georgia, to show the reasonableness of the defendant's fears. In the case from Georgia the testimony proved a continued series of threats, accompanied by acts of violence from the deceased toward the prisoner, commencing some months previously, and coming down to the time of killing, and all showing a determination on the part of the deceased to take the life of Monroe before the next ensuing term of one of the courts of the county where the transaction happened. I repeat that the case at bar differs widely from the case of Monroe just cited from 5 Ga."

The facts in the case from Georgia are almost identical with the case we are now considering. The deceased, Moore, at a party, had sought a personal difficulty with Sloan, which Sloan shunned. Two or three days before the shooting, and again on the day before, he threatened to kill Sloan the "first time he saw him;" that on the occasion last referred to he stated that he "intended to kill him the first time he saw him, as he was nobody but a God-damned Yankee, and should not associate with white folks," and this was communicated to Sloan before the affray. It appears also that when the defendant was in the store Moore came to the door with a revolver, looked in, and requested the proprietor to shut up his store, as he "expected that he and Sloan would have a difficulty, and he did not wish to have it in his house." This remark of Moore the court excluded because it was not communicated to the defendant. In an analogous case in the State of Illinois this same question arose, and the court there held that the evidence was admissible. The court remarks: "Upon the trial the

39—XLVII.

defense offered to prove that on the day, and at other times shortly before his death, the deceased had made threats against the prisoner. This evidence the court ruled out, and an exception was taken. In this the court unquestionably erred, although they may never have come to the knowledge of the defendant till after the homicide was committed. If the deceased had made threats against the defendant it would be a reasonable inference that he sought him for the purpose of executing those threats, and thus they would serve to characterize his conduct toward the prisoner at the time of their meeting and of the affray. If he had threatened to kill, maim or dangerously beat the defendant, it would be a fair inference, especially so long as the evidence shows that he had a hatchet in his hand—that he had attempted to accomplish his declared purpose; and if so, then the prisoner was justified in defending himself, even to the taking of the life of his assailant, if necessary. While the threats of themselves could not have justified the prisoner in assailing and killing the deceased, they might have been of the utmost importance in connection with the other testimony in making out a case of necessary self-defense. The evidence offered was proper, and should have been admitted." (Campbell v. People, 16 Ill. 17.)

In the present case the evidence was highly important and proper to illustrate and explain the character of the act. The threats were continuous and frequent, they were all blended and inseparable; and the last threat, when the deceased had his revolver with him, showing an ability to carry out and accomplish his purpose, went to form a part of the *res gestae*, and must be considered as of the same transaction. They were therefore all admissible in evidence together, not to justify or exculpate the slaying, if it should be found that the defendant was the assailant, but as circumstances to explain the act, and show whether the defendant acted in necessary self-defense.

Defendant proposed to prove that whilst the surgeons were dressing the wound, and immediately after the shooting took place, Moore, in speaking about the matter, said that "Sloan was not in fault, that he had drawn on the difficulty by attacking him, and that if his pistol had not hung when he went to draw

it he would have killed him." This declaration was excluded by the court on the ground that it was no part of the *res gestæ*, and was not shown to have been made *in articulo mortis*.·

In McMillen v. The State, 13 Mo. 30, it was proposed to prove by the witness that she had heard Jackson Logsdon, the deceased, recently before the affray threaten to shoot one of the defendants. The testimony was rejected. Judge Napton, writing the opinion of the court, says: "As Jackson Logsdon was not a party to the prosecution, what he said is no more than the hearsay of any other man, and was therefore upon general principles inadmissible. Had his declarations been *in articulo mortis* or a part of the *res gestæ*, they would have come within the exceptions to the general rule. The bill of exceptions does not show *when* the declarations were made. 'Recently' is a word of indefinite character." Here it is admitted that if the threat had been made at the time the crime was committed, or so soon thereafter as to have made it constitute a part of the *res gestæ*, it would have been properly receivable. The question was directly presented to this court for adjudication in the case of Brownell v. The Pacific R.R., *ante*, p. 239. There the point raised was in reference to the admission of the declaration of Brownell, the deceased, as to how the accident happened. This declaration he made immediately after the accident, and upon a review of the authorities we held the declaration admissible as constituting a part of the *res gestæ*.

The ruling in that case is decisive of this, and there is no necessity for repeating the reasons for the conclusion we there arrived at. The evidence was admissible, and the court erred in rejecting it.

We will not enter upon an examination of the instructions in detail, but only refer to one or two given for the prosecution. The tenth instruction given for the State, in reference to the law of self-defense, is objected to and complained of by the defendant. The instruction, though unhappily and inartistically drawn, is substantially correct. It is in accordance with the doctrine laid down by the best elementary writers, and has been constantly acted upon and enforced by the courts.

When a person apprehends that some one is about to do him great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon appearances, and even kill the assailant if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterward turn out that the appearances were false, and there was, in fact, neither design to do him serious injury nor danger that it would be done. He must decide at his peril upon the force of the circumstances in which he is placed, for that is a matter which will be subject to judicial review. But he will not act at his peril of making that guilt, if appearances prove false which would be innocence had they proved true. (Shorter v. The People, 2 Comst. 193; Campbell v. The People, *supra.*)

On the trial of Thomas O. Selfridge, Judge Parker, afterward Chief Justice of Massachusetts, puts this case as an illustration: " A., in the peaceable pursuit of affairs, sees B. walking rapidly toward him with an outstretched arm and a pistol in his hand, and using violent menaces against his life as he advances. Having approached near enough in the same attitude, A., who has a club in his hand, strikes B. over the head before or at the instant the pistol is discharged, and of the wound B. dies. It turns out that the pistol was loaded with powder only, and that the real design of B. was only to terrify A." Upon this case the judge inquires, " will any reasonable man say that A. is more criminal than he would have been if there had been a bullet in the pistol? Those who hold such a doctrine must require that a man so attacked must, before he strikes the assailant, stop and ascertain how the pistol was loaded — a doctrine which would entirely take away the right of self-defense; and when it is considered that the jury who try the cause, and not the party killing, are to judge of the reasonable ground of his apprehension, no danger can be supposed to flow from this principle." The judge had before instructed the jury that " when, from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life or commit any felony upon his person, the killing of the assailant will be excusable homicide, although it should

afterward appear that no felony was intended." (Selfridge's Trial, 160.) Any other doctrine would destroy the right of self-preservation, and impose a burden which would render persons in dangerous positions powerless to protect themselves.

Our statute has placed killing in self-defense under the head of justifiable homicide, and hence the common-law rule applies in the fullest extent. The law as announced by Judge Parker is of ancient origin. The principle was recognized and acted upon in Levett's case, recited by Jones, J., in Cook's case (Cro. Car. 538), to the following effect: Levett was in bed with his wife and asleep, in the night, when the servant ran to them in fear, and told them that thieves were breaking open the house. He arose suddenly, and, taking a drawn rapier in his hand, went down and was searching the entry for the thieves, when his wife, espying some one whom she knew not in the buttery, cried out to her husband in great fear, "Here they be that would undo us." Levett thereupon hastily entered the buttery in the dark, not knowing who was there, and, thrusting with his rapier before him, killed Francis Freeman, who was lawfully in the house and wholly without fault. On these facts, found by special verdict, the court held that it was not even a case of manslaughter, and the defendant was wholly acquitted. Now here the defendant acted upon information and appearances which were wholly false; and yet, as he had reasonable ground for believing them true, he was held guiltless.

Roscoe, in his work on Criminal Evidence, says it is not essential that an actual felony should be about to be committed in order to justify the killing. If the circumstances are such as that, after all reasonable caution, the party suspects that the felony is about to be immediately committed, he will be justified. (Roscoe's Crim. Ev. 639.) The books give numerous examples, and apply the principle approvingly. (1 Hale, P. C., 42, 474; Hawk., P. C., Curwood's ed., 84; 1 East, P. C., 575; 1 Russell on Crimes, 549–50.)

The eleventh instruction given for the prosecution stated that when a party was indicted for murder he might be convicted of manslaughter, and if the jury believed from the evidence that

Sloan was guilty of manslaughter in the first degree they might assess his punishment at imprisonment in the penitentiary for a term not less than five years ; if in the second degree, for a term not less than three years nor more than five years. Here the court does not undertake to define what it takes to constitute manslaughter in the first degree, the offense of which the jury found the defendant guilty. The jury were palpably misled as to the ingredients of manslaughter in the first degree.

If the killing constituted an offense, it was either murder in the first degree or some of the lesser grades of homicide; but certainly it could not be brought under the definition of the first degree of manslaughter. There was not a scintilla of evidence going to show that that offense was committed.

Manslaughter in the first degree, under the statute, is "the killing of a human being without a design to effect death, by the act, procurement or culpable negligence of another while such other is engaged in the perpetration or the attempt to perpetrate any crime or misdemeanor not amounting to a felony, in cases where such killing would be murder at the common law." (1 Wagn. Stat. 446, § 7.)

It would seem to be plain, from the reading of this statute, that in order to convict the accused of manslaughter in the first degree he must be engaged in committing some other offense besides violence upon the person killed. Upon a statute defining manslaughter precisely as ours, the question came up for determination in the Supreme Court of the State of New York. The prisoner was indicted for killing his wife. At the trial the court charged the jury that if they were satisfied from the evidence that the deceased had come to her death by reason of blows or injuries inflicted upon her by the defendant, not in any self-defense, or otherwise excusably or justifiably, they should find the defendant guilty of manslaughter in the first degree. The charge was held to be erroneous, and the conviction was reversed. In the appellate court the judge said: "If the prisoner killed his wife by violent means (and he must have done so, if at all) no doubt he was engaged in the perpetration of an assault and battery, which is a misdemeanor. But that was part of the act itself which con-

stituted the principal charge. The statute evidently contemplated some other misdemeanor than that which is an ingredient in the imputed offense, otherwise that part of it relating to an attempt to perpetrate a misdemeanor would be wholly nugatory. Where an act becomes criminal from the perpetration or the attempt to perpetrate some other crime, it would seem that the lesser could not be a part of the greater offense. Derivative character must necessarily spring from a distinct, although it may be connected, source. I agree with Judge Bronson in thinking that in order to bring a case within the definition of manslaughter in the first degree, it is necessary to show that the accused was committing or attempting to commit some other offense than that of intentional violence upon the person killed. (The People v. Butler, 3 Parker's Crim. Rep. 377; see also The People v. Sheehan, 49 Barb. 217; The People v. Rector, 19 Wend. 605.)

Upon an indictment for murder in the first degree the accused may be convicted of any lesser grade of homicide, but the conviction must be based on some degree which the evidence shows he is guilty of.

It follows, therefore, that the judgment must be reversed and the cause remanded for a new trial. The other judges concur.