STATE OF MISSOURI, Respondent, *v.* JAMES BANKS, Appellant.

**March 22, 1881.**

1. Where a pistol is purposely discharged at another and causes the latter's death, the presumption of an intention to kill is conclusive.

2. Where one, having threatened to kill another, executes the threat by shooting, his testimony that his intention was not to kill, but simply to frighten his victim, will not warrant an instruction for a grade of homicide less than murder in the first degree.

3. Statements of the deceased made at the time the shot was fired are competent.

4. That the prosecuting attorney exceeds the fair limits within which he should confine himself in his closing argument to the jury is not always a ground for a reversal.

APPEAL from the St. Louis Criminal Court, LAUGHLIN, J. *Affirmed.*

ROBERT W. GOODE, for the appellant: Language not warranted by the evidence and calculated to prejudice the jury should not be used by the prosecuting attorney in his argument. — *The State* v. *Lee*, 66 Mo. 165; *The State* v. *Degonia*, 69 Mo. 485. An unlawful intent is necessary to constitute murder in the first degree. — *The State* v. *Phillips*, 24 Mo. 475; *The State* v. *Hicks*, 27 Mo. 588. The question of intent is an issue for the jury. — *The State* v. *Stewart*, 29 Mo. 419. There was evidence which required an instruction as to murder in the second degree. — *The State* v. *Peyton*, 9 Mo. App. 599; *The State* v. *Curtis*, 70 Mo. 594.

DAVID MURPHY and J. C. NORMILE, for the respondent: Declarations of the deceased made simultaneous with the shooting, were competent. — *The State* v. *Sloan*, 47 Mo. 611; *Brownell* v. *Railroad Co.*, 47 Mo. 239; *Insurance Co.* v. *Mosely*, 8 Wall. 391; *The Commonwealth* v. *Pike*, 3 Cush. 181.

BAKEWELL, J., delivered the opinion of the court.

Defendant was convicted of murder in the first degree. It appears from the evidence that the wife of defendant was employed as a domestic servant in St. Louis; that her husband desired her to leave her service and return to him; that the head of the family in which she was employed insisted that she should do so, in order to relieve the household of the annoyance which was occasioned to the family by the frequent visits and remonstrances of defendant, who complained of his wife living apart from him, and was constantly insisting that she should return. The wife did return to her husband for a few days; but, upon begging to be taken into service again, that she might be protected from her husband, whom she accused of kicking and maltreating her, she was taken back, and resumed her duties as a domestic servant in the same family. Defendant renewed his visits and solicitations, and was forbidden the house by the master of it. Defendant stated to one witness that he would kill his wife if she would not come back to him. On Sunday, March 28, 1880, after dark, as the woman was standing near the window of a room on the first floor, in the house in which she was employed, a shot was fired through the glass by some person outside, which went entirely through her body, and resulted in her death. The master of the house was in the room in which the deceased was washing dishes close to the window when the shot was fired. There was a moon, and it was not quite dark outside. At the time the shot was fired this witness saw a black face at the window. Defendant is a colored man. The witness would not swear that the face was that of Banks, but it looked like it. He says that the person who fired the shot stood on the cellar-door, which was immediately under the window. Banks was arrested as he was getting on a New Orleans steamer. He had on his person a revolver of which two chambers were discharged. He at first denied his

name, but shortly afterwards said to the officer making
the arrest, that concealment was useless; that he had shot
his wife; that she had left him often; she was his property,
and he was determined to have her back; that he shot at
her to scare her. Defendant himself testified that he shot
his wife; that he was in the yard sixty feet off at the time;
that he did not mean to hit her, but wanted to scare her so
that she would come home and live with him; and that he
did not know he had hit her until the policeman told him so.

The court instructed on murder in the first degree. The
instruction was a correct statement of the law of murder in
the first degree, as now defined by the Supreme Court.

Counsel for defendant contends that, inasmuch as defend-
ant testified that he shot at his wife merely to scare her, and
not meaning to hit her, the instructions should not have
been confined to murder in the first degree.

That defendant had threatened to kill his wife, that he
lay in wait for her, that he shot at her, and that he killed
her, there can be no question. Such is the undisputed evi-
dence in the case. As a witness in his own behalf, he testi-
fies that he did not intend to kill her. An intent to kill is
held to be necessary to constitute murder in the first degree,
in Missouri. *The State* v. *Lane*, 64 Mo. 320. Did this
statement of defendant tend to rebut the presumption of
an intent to kill arising from the undisputed facts of the
case? If so, we can conceive no case of homicide in which
it will not be necessary for the trial court to give instruc-
tions on various degrees of criminal homicide. The pris-
oner being a competent witness in his own behalf, the pois-
oner will swear that his intention was not to kill, but merely
to give his victim a pain in the stomach. If one kills an
infant by holding its head under water for half an hour, he
may swear that his intention was not to kill, but to scare
the child into submission.

In matters that regard the conduct of men, mathematical
certainty cannot be had. But there is a moral certainty

that a sane man who discharges a loaded gun at another within range, knowing the gun to be loaded, intends to kill the person at whom he fires. An irresistible inference of an intention to kill arises in the human mind as soon as the facts established in the present case appear, independently of any reasoning on the subject. This irresistible inference arises from the experience which men have of the connection between certain acts and the intention. That every one is presumed to contemplate the natural and probable consequences of his acts, is a maxim. This presumption is a conclusive presumption. Without it the commerce of society could not go on, and the administration of criminal law would be impossible. The intent to kill is conclusively inferred from the deliberate use upon the person killed of a deadly weapon. 1 Greenl. on Ev., sect. 18. The rule attaches itself to the circumstances proved, not as deduced from them, not as a rule of inference from testimony, but as a rule of protection, as expedient, and for the general good. What passes in the mind of another can be known only by his acts and declarations at the time. It would, of course, always be competent to show that the deadly weapon was discharged by accident, or that it was pointed at the deceased by accident; but where the testimony of previous threats and of a homicide by lying in wait is clear, we do not think that a statement of the prisoner on the witness-stand, that he shot at the deceased, not to kill, but to scare her, furnishes any substantial evidence upon which to found an instruction for any degree of homicide below murder in the first degree.

The prosecuting attorney, in his opening address to the jury, stated that he would show that the deceased, when shot, exclaimed, "Banks has shot me." The prosecuting attorney asked a witness who was present at the homicide, what deceased said when struck by the pistol-ball. Defendant's attorney objected on the ground that defendant was not present at the time. The objection was sustained.

The exclamation of deceased at the moment she was shot was competent. *The State* v. *Sloan*, 47 Mo. 611 ; *Brownell* v. *Railroad Co.*, 47 Mo. 239. The circuit attorney had a right to show, if he could, that she cried out at the moment, "Banks has shot me." No ground, therefore, appears for objection to his opening statement.

In his closing address the attorney for the State said : "Shall I tell you of the brutal treatment of the wife by the defendant? the abuse, the kicking, the beating, to force her from Captain Bartle's protection and to drag her to pander to his lust, to gratify his passion? If this don't show a mind depraved and fatally bent on mischief, I don't know what the term means. What was his claim to the officer? 'She's my property, and I'll do with her as I please.' Now, can his attorney say he didn't mean to kill her, when the proof is he came within three feet of her? He said, 'I wasn't going to stand any such conduct as that from my property : if she won't go with me I'll make her ; and if I can't make her I'll kill her.' "

There was no evidence that defendant kicked his wife, though there was evidence that she had stated he had done so. This testimony as to her statements about her husband's cruel treatment was all admitted without objection on the part of defendant, perhaps as bearing upon the theory of the defence that she had left her husband, and that he fired at her to persuade her to return. Counsel, in argument to the jury, should, in their remarks upon evidence, confine themselves, of course, to what has been testified to. But if counsel on the other side have, without objection, permitted evidence to go to the jury which might have been excluded, it cannot be a ground for reversal that such evidence is alluded to in argument to the jury. In the present case, there is no room for doubt that the defendant killed his wife, and that, under circumstances which make the homicide murder in the first degree. No other verdict than that rendered could be honestly given on the evidence ;

and whether the closing remarks of the prosecuting attorney exceeded the fair limits within which he should confine himself, or not, they are certainly no ground for reversing the judgment.

We see no error in the record, and the judgment is affirmed. All the judges concur.