[No. 3146.]

## JOHN TURNER *v.* THE STATE.

1. MURDER—RIGHT OF DECEASED TO REPEL INVASION OF HIS HOUSE—CHARGE OF THE COURT.—In a murder trial, the court, upon request of the State, charged the jury as follows: "Every man has a right to protect his house from invasion and his family from insult, and, in so protecting them, he has a right to use such force as may be necessary to accomplish his end, after verbal remonstrance has failed; and in the use of such force he will not be considered an aggressor or violator of the law." *Held,* that, while correct in the abstract, this charge was error, in view of the evidence on the question; first, because the evidence shows that there was no invasion of the deceased's premises by the defendant and his associates, but that, on the contrary, they entered upon the premises by invitation of the deceased; and, second, because, having so instructed the jury, the court should have further instructed them that if deceased used greater force or more dangerous means than were necessary to effect the expulsion of the parties, he thereby became himself an aggressor, and was no longer entitled to the immunity which the law, up to that time, afforded him in the protection of his castle. See the opinion *in extenso* on the question.

2. SAME—SELF-DEFENSE.—At the instance of the State, the court further instructed the jury as follows: "If you believe from the evidence that defendant and Britton Turner and Tom Stanley went to the house of deceased and cursed and swore and raised a disturbance in the yard of deceased, and were bid by deceased to leave, and refused to do so, then deceased had a right to use all necessary force to put them out of the yard, and if they resisted such force, they cannot justify such resistance on the grounds of self-defense." *Held,* correct in principle, but, in view of the evidence, insufficient in that it did not further charge, in substance, that if the deceased used more force than was necessary to expel the parties, and thereby became himself the aggressor, the law accorded to Stanley the right of defense to the extent of protecting himself against

the excessive force used. Note the circumstances of this case, wherein it is *held* that if S., the party who inflicted the fatal blow, acted in self-defense, and was justifiable, the defendant would also be guiltless of the homicide.

3. SAME — PRACTICE — CASE STATED.—The charges recited were special charges given at the instance of the State, but were not excepted to by the defendant on the trial, nor did he ask additional instructions. They were, however, complained of by him in his motion for new trial. This motion also complained of the failure of the court to charge all the law of the case. *Held*, that the special charges, given in such manner, separate and distinct from the main charge and from each other, and without being accompanied by a further explanation of the law of the case, were calculated to mislead the jury, and materially to prejudice the rights of the defendant.

4. SAME—CHARGE OF THE COURT—IMPLIED MALICE.—Where the fact of unlawful killing is established, and there are no circumstances in evidence which tend to establish the existence of express malice, nor which tend to mitigate, excuse or justify the act, then the law implies malice, and the offense is murder in the second degree. See the opinion for a charge upon the subject *held* inconsistent with the rule announced, insofar as in explaining implied malice it omits the qualification that where a homicide is committed under "mitigating circumstances" malice is not implied, although the homicide may be neither excusable nor justifiable. Note the suggestion of this court on the subject.

APPEAL from the District Court of Houston. Tried below before the Hon. J. R. Kennard.

The indictment in this case charged the appellant with the murder of G. W. Montzingo, in Houston county, Texas, on the twenty-seventh day of October, 1883, by stabbing him with a knife. He was convicted of murder in the second degree, and his punishment was assessed at a term of fifteen years in the penitentiary.

Fletcher Thomas, the first witness introduced for the State, testified that he lived on Nevill's prairie, in Houston county, Texas. He knew the defendant, and knew the deceased, G. W. Montzingo, at the time of his death. The witness saw the defendant in the town of Lovelady, in Houston county, on the evening before the killing. At the same time, and in the same town, he saw Tom Stanley and the deceased together. He remembered no other persons he saw at the time. He heard the defendant tell the deceased to take an ax handle and wear Tom Stanley out with it. Something was said about a saddle, which the witness did not understand.

Bob Stevens was the next witness put on the stand by the

State. He testified that, in the latter part of October, 1883, when the deceased was killed, he, witness, lived in Walker county near the line, and near Nevill's prairie. His house was situated on the road between the houses of the defendant and the deceased, some three or four hundred yards distant from the former, and about three hundred and fifty yards distant from the latter. On the evening of the killing, which occurred in Houston county, late in October, 1883, the witness was in a ditch near the road and heard the defendant say: "Let's go down to the old son of a b—h's house and see him." The witness saw no one at this time, but distinctly heard this remark made by the defendant. Witness did not see the defendant, or Stanley or Britton, before the killing. After the killing, the defendant came to the witness's house and told him that he wanted him to go down to Whit's house; that Tom Stanley had cut Montzingo, he expected fatally. The defendant said at that time that a difficulty had occurred. He had a gun with him. The witness went at once to Montzingo's house, and found him lying on the gallery. His wife and children were in the house. Doctor Glover arrived at the house of the deceased soon after the witness did. The witness saw no blood at the house of the deceased except on the gate post on the outside of the paling, and in the walk leading from the gate to the house. The witness did not think that the feeling between the deceased and the defendant was good at the time of the homicide. A few days before the killing the defendant said that the deceased owed him a small sum an l would not pay it, and it was from this the witness inferred that the feeling between the defendant and deceased was not good. The defendant lived with his father, some seven or eight hundred yards distant from the deceased's.

Referring to the remark the witness overheard the defendant make just before the homicide, the witness said he was in a ditch at the time watering his oxen. At the house of the deceased, the witness asked Mrs. Montzingo for deceased's gun. She looked for it but could not find it, and it was supposed that the gun had been taken off. Buck Shaw was there, but said nothing about the gun, nor where it was, before he went off. He came back after dark and said that he knew where the gun was; that it was out against the fence, where it was found. It had been previously looked for at that place. From the gate to the gallery the distance is about seven or eight steps. When the defendant came to the witness's house and asked him to go

and attend to Montzingo, he said: "We got into a difficulty, and Stanley cut Montzingo three times." Tom Stanley, the defendant and Buck Shaw came by the witness's house, Buck Shaw walking. Henry Montzingo and Britton Turner both told witness that the latter went after the doctor for the deceased. The witness did not know where the deceased lived during the year 1882, but had hear him say that he lived at the place of Turner's father. No lawyers that the witness knew were present at the inquest over Montzingo's body. After the witness heard the defendant say "let's go to the son of a b—h's house," he went to the well to get a bucket of water, and while there heard loud talking at Montzingo's house. Tom Stanley and Buck Shaw came to witness's house just after witness got back with the water.

Doctor Glover testified, for the State, that he was called in to see the deceased in October, 1883, and found him suffering from two wounds. One wound was in the back just under the shoulder blade, and it looked like it had been inflicted with a knife or ax. It was three and a half or four inches long. The second wound was in the breast and was one inch and a half long, cutting the heart. Either of these wounds would have proved fatal. The deceased was dead when the witness reached him. A man cut in the region of the heart would bleed profusely. Witness saw no blood outside the gate. Mr. Stevens and the family of the deceased were at the house of the deceased when the witness arrived. Mrs. Montzingo, the wife of the deceased, was cut upon the arm and was otherwise bruised. The witness saw an ax lying on the ground, one or two feet inside the gate. The wound under the shoulder blade had the appearance of having been inflicted with an ax.

The deceased went to the town of Lovelady with the witness, about twelve o'clock on the day that he was killed, and returned with McManners. Witness saw the defendant, Britton Turner and Tom Stanley in the town of Lovelady on that day. Witness saw Britton Turner after the killing. Britton called him to go and see deceased. The deceased was a man of feeble health, and would not have weighed above one hundred and thirty or one hundred and thirty-five pounds at the time of his death. The defendant, Britton Turner and Tom Stanley are all able bodied, stout men. The witness thought good feeling existed between the parties. Messrs. Wills, Worthington and Hooper assisted the witness in hunting for blood about the premises, but

none was found outside the gate. Witness saw blood on the ax and on the handle of the ax, as it lay in the yard. Witness went to Lovelady after the officers. Mr. Moore made the arrest of the defendant, Britton Turner and Tom Stanley. They were arrested at Mr. Turner's old place, where Mr. Williamson lives. The wound under the shoulder blade could have been made with an extraordinary knife.

The witness testified that he had been practicing medicine for twenty-eight years. He was not, however, a regular graduate, and had no diploma, but was recognized and consulted by his medical brethren as a physician. He felt much interest in the present case, and was one of the private prosecutors. He assisted in forming the jury, and aided in raising money to employ special counsel for the prosecution. He was impelled to do this by the poverty of deceased, and the further fact that the deceased, when killed, was his tenant. If the heart of a man be pierced by a knife, blood will instantly follow the withdrawal of the instrument. Montzingo's shirt was so torn as to leave nothing to obstruct the flow of blood.

Mrs. Montzingo was the next witness for the State. She testified that she was the widow of the deceased. Some time in the month of October, 1883, about sundown, the defendant, with Britton Turner and Tom Stanley, rode up to the house of the deceased and hailed the deceased at the gate. The parties named then got down from their horses and came into the yard. The defendant walked up to the step on the gallery, put his hand on deceased's shoulder, and said: "Mr. Montzingo, I understand that you have been cursing and abusing my father." Deceased denied that he had ever done so. At this point Britton Turner threw his hat on the gallery, and said that he could whip any man who talked about his father. Witness ordered the party out of the yard, because, as she told them, they had come to create a difficulty. Witness repeated the order three different times. They did not go. The deceased ordered them to leave the yard, and upon their failure to leave, the deceased caught up an ax handle and struck Tom Stanley. Thereupon the defendant, Britton Turner and Stanley backed toward the gate, facing the deceased. The deceased struck Stanley a second blow with the ax handle, while they were about half way between the gallery and the gate. The three parties then gathered around the deceased and killed him. The deceased did not strike Stanley on the head, but on the shoulder. Britton Turner

went to the wood pile and stooped as though picking up something. After the difficulty the witness saw an ax lying in the yard, stained with blood from one end to the other. Witness left this ax at the wood pile, about ten feet outside the gate, that evening. Stanley cut the witness with a knife, and some one of the party, witness did not know who, struck her with an ax handle. The witness had two children. The difficulty, which terminated in this homicide, occurred in the yard of the deceased.

The defendant, Britton Turner and Stanley left immediately after the difficulty, and the deceased died within five minutes. Witness did not see any one strike the deceased with the ax, but just after the difficulty she saw the ax lying, bloody, across the gate opening inside the yard. She did not see the ax used during the difficulty. She did not hear the defendant tell Stanley that they intended to have no difficulty at the house. She saw Buck Shaw on the place before the conclusion of the difficulty. He was there on horseback. After the cutting the witness's step-son, Henry Montzingo, went into the house and got the gun, which the defendant took from him, and carried off. The gun was next found in the corner of the fence. The deceased stripped off his coat before he caught up the ax handle and struck Stanley. The witness testified before the jury of inquest, but did not state on that investigation that the deceased struck Stanley three times with the ax handle. She did not state on her examination that the deceased backed the party to the gate before the cutting. They never reached the gate before the cutting. She did not state at the inquest that the several parties were at and just in the gate when the deceased ran up to Stanley. Witness did not see who of the parties stabbed the deceased, but saw Stanley have a pocket knife in his hand after the cutting. The witness saw no other weapons of any kind during the fight.

Britton Turner came to the deceased's house on the morning of the homicide, and asked if deceased was going to town; saying that, if so, they would go together. Witness knew of no previous difficulty of any kind between the deceased and any of the parties, and had no idea what the occasion of this difficulty was. Blood was scattered all about the place on the inside, but witness saw none outside the yard. There was blood on the gate post, and there was blood on the persons of the witness and her children. Witness's step-son, Henry, and Britton Turner went

after Doctor Glover, who arrived within a few minutes after the cutting. The deceased's shirt was torn almost entirely off of him during the fight. Witness saw the whole of the difficulty. She was present and testified at the inquest, but at the time was laboring under great mental excitement.

Henry Montzingo, the son of the deceased, and step-son of the last witness, was next introduced by the State. He testified that he saw all of the difficulty in which his father lost his life. The three parties charged with this .homicide rode up to deceased's gate, hailed the deceased and got down from their horses. Deceased invited them in. They came in, and the defendant walked up to the steps, put his hand on the deceased's shoulder, and accused him of cursing and abusing old man Turner. Deceased denied having done so. The defendant then called on Stanley to prove that deceased had cursed and abused old man Turner, the defendant's father. Mrs. Montzingo at this point ordered the party to leave the place, but they would not go. The deceased then ordered them to leave, and they again refused. Deceased then caught up an ax handle, pulled off his coat and struck Stanley a blow on the head. The party then backed towards the gate. The deceased pursued and struck Stanley a second blow, and struck at him a third time, which last blow was warded off Stanley by the defendant. Stanley then ran up to the deceased and made a motion at him as though cutting him. At this time the party was about two feet inside of the gate. After cutting the deceased Stanley ran off towards the prairie on foot, his horse having broke loose. Witness did not know where the defendant went to. The witness saw no ax used during the difficulty, but he saw an ax on the ground after the difficulty. There was some blood on the blade, and some few drops on the handle. When the deceased cried out that he was cut, the witness ran into the house, got a gun and returned. The defendant took the gun away from the witness, but made no effort to use it. Witness saw considerable blood in the yard, but none on the outside. Several persons examined the premises for blood.

The witness heard no loud or angry words used during the fight except those used at the time that the defendant caught the deceased's shoulder when he first stepped up to the gallery. Stanley was standing out in the yard between the gallery and the gate, when called upon by the defendant to verify the charge against the deceased of having cursed old man Turner. All

three of the parties backed when the deceased struck Stanley with the ax handle. Stanley ran into the deceased when the latter struck at him the third time. Witness did not see the defendant make any effort to hurt the deceased. The ax handle used by the deceased was a new one. It was lying on the gallery, and when the deceased went to pick it up the defendant, who was then standing on one of the steps, backed off. Deceased said to Stanley: "You are the man who told the lie; get out," and struck him. Stanley was not quite to the gate when the deceased struck at him the third time. Witness at no time during the fight heard defendant say to Stanley: "Cut him" or "kill him." Britton Turner went for the doctor, and arrived at the doctor's house before the witness did. Witness's mother (step-mother) was cut on the arm by some one, the witness did not know who. The witness saw an ax lying in the walk between the gate and the gallery, after the fight, but did not know how it came to be bloody. A man, if cut outside the gate, in going to the point where the deceased fell, would have had to pass over the ax if it lay in the yard where the witness saw it. Witness saw blood on the left gate post, as one goes into the yard, but saw no blood outside the yard. When the party first came to the house Britton Turner said, throwing his hat down on the gallery, that he could whip any man who abused his father. The witness heard no one of the parties say that they had not come for a difficulty. At this point the State closed.

Buck Shaw was the first witness introduced by the defense. He testified that he was in no way related to any of the parties to this difficulty. He was present at the time of the difficulty, and saw the whole of it. As the witness rode up to the house of the deceased he heard a conversation between the defendant and Mrs. Montzingo. The deceased said that he had not cursed and abused old man Turner. The defendant and Britton Turner then remarked that they had nothing against the deceased, and the defendant further said to the deceased that he did not care how much deceased cursed him, but that he could not abuse his father. The deceased then picked up an ax handle, and pointing it at Stanley, said: "There is the G—d d—d son of a b—h who told the lie." Deceased then ordered the party to "get out." They all walked out of the yard at the same time. Deceased then started out of the yard after them, and defendant caught him to keep him from going out of the yard. The deceased then struck Stanley twice with the ax handle, and struck at him the

third time, when Stanley ran off. Deceased ran after Stanley, and Stanley turned and cut him. Deceased did not even touch Stanley in the yard, and no one was hurt in any manner until the parties got entirely out of the yard. Witness sat on his horse within ten feet of the fight, and saw it all. After the deceased was wounded he went back into the yard and sat down on the door steps. Stanley was a smaller man than the deceased. When the deceased said that he was cut, he also said to the defendant: "John, Stanley has killed me." Henry, the deceased's son, then ran into the house and got his father's gun, which the defendant took away from him, asking him what he wanted with it. Henry replied that he got the gun for the purpose of shooting Stanley.

The witness remained at the house of the deceased but a few minutes after the difficulty, but was back there next day, and saw blood on the gate post, and also on the beam of a plow that stood outside the gate. The witness had known both the defendant and the deceased for several years, and had always known them to be friendly to each other. The witness saw nothing of a bloody ax about the deceased's premises. The witness was arrested for complicity in this homicide. The deceased never forbade the witness visiting a young lady—a sister-in-law of this defendant—at his, deceased's, house. The witness had stated that the Turner girls were crying when he, witness, was at their house, and that they asked him to go to Montzingo's and stop the difficulty. Witness was at that time visiting a sister of the defendant. An unfortunate circumstance has happened to one of Mr. Turner's daughters since the death of Montzingo. The witness heard Britton Turner tell Stanley, at the house of deceased, that if he, Stanley, took the d—d lie, that he, Britton, would whip him, Stanley. Witness saw Stanley with a knife before any blow was struck, and saw him strike deceased three or four times. Witness was not at or about the house of the deceased that night, looking after the gun. Witness and the parties charged with this offense did not meet Bob Stevens that evening. Stevens was at home. The defendant had no gun when he and defendant went to Stevens's house. Mrs. Montzingo was in the yard when the deceased caught up the ax handle. The grand jury found no indictment against the witness for complicity in this killing.

George W. Rowan was the next witness for the defense. He testified that he was in no way related to any of the parties to

this prosecution. He had known them all, defendant and deceased, for about three years. The witness saw the defendant and the deceased in the town of Lovelady on the day of the killing. He went home with the defendant, a short time before sundown. Stanley, who had been to town, came to Mr. Turner's a short time afterward. Stanley was living with the Turners at that time. Britton Turner, defendant and Stanley, after a time, went off in the direction of the deceased's house. They said nothing about where they were going. Witness was at the house of the deceased the next morning. He saw blood on the gate post, on the palings to the left of the post, on the beam of a plow that stood about five feet from the gate, and on some chips that lay about five feet in front of the gate. The chips had been somewhat stirred up. He saw an ax to the right of the gate, at the wood pile. The handle was somewhat bloody, but the witness saw no blood on the ax. The defendant and the deceased always appeared friendly. Witness had seen the deceased and all the parties charged with the murder together, and had never known or heard of hard feelings existing between them. He had never heard of any threats uttered against the deceased. Witness was a single man. Neither Buck nor James Shaw were married men.

Witness stayed at Mr. Turner's house all night the night of the killing. Witness did not know the location of the place called the "old Turner place." Witness went to the house of Mr. Clark, Mr. Turner's son-in-law, to tell Mr. Turner about the occurrence, remained about one hour, and returned to Mr. Turner's that night and remained all night. He went to Mr. Clark's to see Mr. Turner at the suggestion of James Shaw. The blood on the pickets (palings) spoken of by witness extended over three pickets to the left of the gate post, going into the yard.

J. B. Jones was the next witness for the defense. He testified that he was at the house of the deceased on the next day after the killing, about eight or ten o'clock. He saw blood on the pickets outside of the fence, on the gate post, on some chips four or five feet from the gate, and on the beam of a plow. He saw no blood on the axe. The gate was standing open when the witness got to the house. There was a great deal of blood about the gate. It was on the left of the gate, and on the pickets to the left of the gate, as one would go into the yard. The blood on the chips was in drops.

James Shaw testified, for the defense, that he had known the

defendant for ten years, and, at the time of his death, had known the deceased about six years. He was at the house of the deceased on the morning after the killing, and saw blood on the palings and chips, the fence post and a plow beam outside the yard. The witness was with the parties on the day that the killing occurred, but was not present when it did occur. He had never heard any of the parties, deceased or defendants, say anything ill of each other. The father of the defendant was at the house of his daughter, Mrs. Clark, when the killing occurred. Witness and Buck Shaw were brothers. No particular person told Buck Shaw to go to deceased's house on the night of the killing. He was advised to go, as the boys might flog the deceased. Witness was arrested as a party to this homicide, but was released on the day of his arrest.

The defense then introduced the written testimony of Mrs. Montzingo, taken before the jury of inquest, and read from it as follows: "Mr. Montzingo took off his coat, took up an ax handle. As they all backed in line to the gate, Mr. Montzingo struck Tom Stanley. Then Mr. Montzingo struck at Stanley three or four times. When Stanley ran up to Mr. Montzingo, we were just in the gate."

The motion for new trial raised the questions discussed in the opinion, and denounced the verdict as against both the law and the evidence.

*Cooper & Cooper*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. In October, 1883, G. W. Montzingo was killed at his home, in Houston county. He was stabbed to death with a knife by one Thomas Stanley. The killing occurred near sundown of the day. Montzingo, Stanley, defendant, and Britton Turner had met together on that day in Lovelady, a town about four miles distant from Montzingo's home. While in Lovelady, and also while returning home from there in the evening, Montzingo and Stanley had some angry words with each other about a saddle. The evidence shows no bad feeling between Montzingo and the Turners, but, on the contrary, shows that they were friendly with each other. The Turners and Stanley resided but a short distance, not exceeding half a mile, from Montzingo's. The Turners reached home on that evening be-

fore Stanley did, and when Stanley came he told them, it seems, that Montzingo had been cursing their father. Learning this, John Turner, the defendant, was heard to remark that they would go and see Montzingo about it, at the same time using an abusive epithet toward Montzingo. Defendant, Britton Turner and Stanley then went together to Montzingo's, and upon arriving at the gate were invited by Montzingo, who was in the gallery of his house, to come into the house. They went up to the gallery of the house, which was about fifteen feet from the gate, and defendant stepped upon the gallery, put his hand upon deceased's shoulder, and told him that he had heard that he had been cursing and abusing his father. Deceased denied the charge, and defendant said, "there is your man," pointing to Stanley. At this juncture both Montzingo and his wife ordered them all to leave the house and yard, which they did not at once do. Montzingo then pulled off his coat, seized a new ax handle, and advanced rapidly and angrily upon Stanley. Stanley and the Turners fell back toward the gate. Montzingo, while they were retreating, struck Stanley twice or three times with the ax handle, and, upon being struck the second or third time, Stanley cut him with a knife. There is a conflict in the evidence as to the exact point at which the cutting occurred, whether inside or outside the yard. It is evident, however, that it took place very near the gate. No one was seen to strike deceased except Stanley. Defendant did not strike, or attempt to strike, the deceased, and said nothing during the rencounter between deceased and Stanley. Neither the Turners nor Stanley had any other weapons that were seen, except the knife with which the killing was done.

We have recited the main facts for the purpose of making our views of the questions of law which we find it necessary to determine the more readily understood.

At the request of the district attorney, the court gave to the jury the following special instruction: "Every man has a right to protect his house from invasion and his family from insult, and in so protecting them he has a right to use such force as may be necessary to accomplish his end, after verbal remonstrance has failed; and in the use of such force he will not be considered an aggressor or violator of the law." Abstractly considered, this charge was correct; but when given with reference to the facts of this case, we are of the opinion that it is materially objectionable.

In the first place, the evidence did not authorize the charge upon the hypothesis that the Turners and Stanley had *invaded* deceased's house. The proof was that deceased had invited them into his house. They were in his house with his consent, and were not trespassers. They were not, therefore, guilty of an *invasion* of deceased's house in the sense in which that word was used in the charge, and it was error to convey the impression, as we think this charge does, that the entry of defendant and his companions into deceased's house was an *invasion* of it; that is, an unlawful, unauthorized entry, when the evidence showed the entry to have been with the consent and upon the invitation of the deceased. Secondly, having instructed the jury that the deceased had the right to use such force as might be necessary to expel these parties from his premises, without himself becoming the aggressor or violator of the law, the jury should have been further instructed in this connection that if deceased used greater force or more dangerous means than were necessary to effect their expulsion, he thereby himself became an aggressor and violator of the law, and no longer entitled to the immunity which the law up to that point had afforded him in the defense of his castle. We think the evidence in this case clearly demanded this further explanation of the law, to be considered by the jury in connection with the special charge given. (1 Bish. Crim. Law, sec. 859; Whart. on Homicide, secs. 552, 419, 420; *McCoy* v. *The State*, 3 English, Ark., 451.)

Another special charge given to the jury at the request of the district attorney is as follows: "If you believe from the evidence that defendant and Britton Turner and Tom Stanley went to the house of deceased, and cursed and swore and raised a disturbance in the yard of deceased, and were bid by deceased to leave and refused to do so, then deceased had a right to use all necessary force to put them out of his yard, and if they resisted such force they cannot justify such resistance on the grounds of self-defense." This charge is also correct in principle, but it does not go far enough. Suppose the jury should believe from the evidence that deceased used *more* force than was necessary to expel the parties, what were the rights of these parties then? Under the evidence in this case this was a most important inquiry, a most vital issue, and should have been clearly, fully and pointedly submitted to the jury by proper instructions from the court. If the deceased, in ejecting Stanley

from his premises, used greater force than was necessary, he thereby, as we have before stated, himself became an aggressor; and to the extent of protecting himself against this excessive force the law would accord to Stanley the right of defense. This phase of the case was not submitted to the jury, and yet the evidence plainly requires that it should have been. (Whart. on Hom., sec. 552; *State* v. *Sloan*, 47 Mo., 604; *Guschia* v. *The State*, 53 Ill., 295; *King* v. *The State*, 13 Texas Ct. App., 277.) If Stanley acted in self-defense, and was justifiable in slaying the deceased, this defendant was also guiltless of the homicide.

These special charges, given at the instance of the district attorney, were not excepted to by defendant at the trial, nor did he ask any additional instructions, but he complained of said special charges in his motion for a new trial, and also complained that the court had failed to give to the jury all the law of the case. In our opinion the said special charges, given in the manner in which they were, separate from the main charge, and separate from each other, and without being accompanied with a further exposition of the law, in case the jury should believe from the evidence that deceased had used more force than was necessary to eject Stanley, were calculated to mislead the jury, and to materially prejudice the rights of this defendant.

It is further objected to the charge of the court that it is defective in not properly defining *implied malice.* Upon this subject the charge is as follows: "Implied malice is that inferred by law from the facts and circumstances proved in every case of intentional homicide, when the evidence fails to show that it was committed under the immediate influence of sudden passion arising from an adequate cause, or that it was excusable or justifiable in law."

In *Harris* v. *The State*, 8 Texas Court of Appeals, 90, implied malice is thus explained: "When the fact of unlawful killing is established, and there are no circumstances in evidence which may tend to establish the existence of express malice, nor which may tend to mitigate, excuse or justify the act, then the law implies malice, and the offense is murder in the second degree." This definition has been repeatedly approved by subsequent decisions of this court. (*Douglass* v. *The State*, 8 Texas Ct. App., 520; *Neyland* v. *The State*, 13 Texas Ct. App., 536; *Reynolds* v. *The State*, 14 Texas Ct. App., 427.)

It will be noticed that the definition given by the learned judge in his charge and that given in the Harris case are not

substantially the same.    Where a homicide is committed under
"mitigating circumstances" malice is not implied, although the
homicide may be neither excusable or justifiable.    The charge
omits this qualification in explaining implied malice, and in
Neyland's case, *supra*, such an omission was held error.    It is
true that the charge excludes from the definition of implied mal-
ice a homicide committed under the immediate influence of sud-
den passion arising from an adequate cause, and this, it may be
contended, would supply the omission of "mitigating circum-
stances."    Whether this be so or not, it is always best to follow
as near as practicable the well settled rules of the law in fram-
ing a charge upon such points, as there can then be no embar-
rassing questions raised as to the sufficiency of the charge in
respect to such matters.

Because we think the court erred in giving, without further
explanation, the two special charges requested by the district
attorney, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered June 4, 1884.