THE STATE v. THOMAS AND ALLEN SWAIN, *Appellants.*

| 68 | 605 |
| 100 | 107 |
| 100 | 119 |

| 68 | 605 |
| 118 | 18 |

| 68 | 605 |
| 121 | 148 |

1. **Res Gestae.** On the trial of the defendants for murder, testimony was offered and admitted showing that the deceased was seen riding rapidly down the road, and soon after a party of men, among whom were defendants, were seen riding in the same direction, likewise at .a rapid gait; that soon after the party passed the witness, a pistol shot was fired, and some one of the party was heard to say: "Did you get him?" and another one replied: "Not yet." Three quarters of an hour later deceased met the same party a mile further down the road, and it was in an altercation which then ensued with one or more of them, that he was killed. The evidence relied on by the State.to show who did the killing, was wholly circum-. stantial. *Held*, that the foregoing testimony should not have been admitted. The occurrences related were not near enough to the homicide in point of time to constitute part of the *res gestae.*

2. **Evidence of Conspiracy.** Such testimony as the foregoing might be received as evidence tending to prove a conspiracy between the defendants and others to effect the death of the deceased, but it should be accompanied by evidence that the defendants were participants in the crime.

3. **Evidence of Good Character.** When the defendant in a criminal case has given evidence tending.to establish his good character, he is entitled to have the jury instructed as to its effect.

4. **Absent Witness:** IMPEACHING EVIDENCE: CONTINUANCE. Where, in order to avoid a continuance, the prosecuting attorney, under the act of 1875, (Sess. Acts 1875, p. 104,) consents that the defendant may read to the jury a statement of what an absent witness would swear to if present, as his testimony, the State may, by way of impeachment, give evidence to show that such witness has made a contrary statement; but the jury should be instructed, in explicit terms, that such evidence is received only for the purpose of destroying the effect of the absent witness' testimony, and not as evidence of defendant's guilt.

5. **Accused Testifying for Himself.** A defendant testifying in his own behalf, in a criminal case, has as much credibility attached to his testimony as if testifying in a similar manner in a civil case.

6. **Reasonable Doubt—Captious Doubt.** The court condemns, as an innovation, an instruction that a captious doubt, or a mere possibility of innocence, is not to be regarded as a reasonable doubt.

*Appeal from Newton Circuit Court.*—HON. JOSEPH CRAVENS,
Judge.

The court gave the usual instruction as to reasonable doubt, and added that "a captious doubt, or mere possibility of innocence, is not to be regarded as a reasonable doubt."

*C. W. Thrasher* and *H. C. Young* for appellants.

*J. L. Smith,* Attorney-General, for the State.

Sherwood, C. J.—One Jasper Hale, J. O. Swain, and his brothers, Thomas and Allen ·Swain, the defendants, were jointly indicted for murder in the first degree, in the killing of Paul Marshall; the first count charging all the defendants as principals; the second, Hale as principal, the others as aiders and abettors. Hale was not arrested. On trial had, J. O. Swain was acquitted, and the defendants convicted of murder in the second degree, their punishment being assessed at seventeen years each in the penitentiary, and they appeal here, alleging for the reversal of the judgment against them, many errors as having occurred during the progress of, and subsequent to the trial. In view of the conclusion reached, that this cause must be retried, it is deemed unnecessary to advert to all the exceptions, as the cause, in most particulars, was very well tried, and no objection is perceived to those instructions relating to the different degrees of murder.

The evidence as to who did the killing was altogether circumstantial. It seems from the evidence that defendants, J. O. Swain, Benton Davis and Andrew Curry, went to Newtonia from the house of defendants' father, who lived some five miles south of that town, to see a game of base ball played between two companies. On their way thither they were overtaken by Jasper Hale. On arriving at Newtonia, Thomas Swain and some others of those mentioned, participated in the game. About four o'clock in the afternoon the defendants, J. O. Swain, Hale, Curry, Davis and Thos. E. Pearson, started on horse-back from

Newtonia on the road in the direction of their homes. Before they had traveled more than about one-quarter of a mile they were overtaken by the deceased, Marshall, who, it seems, was at that time on good terms with all the company, and who rode with first one and then the other of them, for some three miles, when he took a more rapid gait and rode ahead of them, and out of sight—finally stopping at Heilig's house, four miles south of Newtonia, where, on being invited, he hitched his horse and went into the house, by which time it was nearly dark. The nearest and most direct route homeward of the defendants and the party with them, with the exception, perhaps, of Davis and Curry, lay directly past Heilig's house, as shown by the testimony and plat of the witness Moore. The party, consisting of the defendants and those with them, seven in number, who were evidently under the influence of the cup which cheers but also inebriates, soon afterwards rode up in front of Heilig's house, situate some fifteen yards from the Newtonia road, and commenced debating in loud and boisterous tones, not unmingled with profanity, the question whether they should go to Harmony church to attend a religious meeting then in progress there, or should proceed to their respective homes. While the matter was under discussion, Marshall, being in the house, announced his intention of going out to where the party of young men were, and being advised by Mary Heilig not to do so, replied: "The boys won't hurt me," got up and went out into the yard, was recognized by them while there, proceeded out to them, when almost as soon as he got there one of the party rode off; one said, " Are you gone ?" one said, " I want peace ;" another said, " I do too;" in a few minutes afterward shooting was heard; next the sound of horses' feet going south on the Newtonia road; next the sound of conversation some 150 yards from the house in the direction the horses had gone, and in an hour and a half from that time the body of Marshall, who, it seems, was unarmed, was found about five feet

from the side of the Newtonia road, eighty-five yards from Heilig's house, about sixty-eight yards north of where the party had stopped, riddled with a number of balls of apparently different sizes, and corresponding, it seems, to pistols of similar kinds at the time in the possession of Jasper Hale and Thos. Swain; but there was testimony also conducing to show that the bullets found in the body were all originally of the same size, and that the latter had bought that day in Newtonia a box of pistol cartridges. Of the wounds on the body of the deceased, some were inflicted as if by one or more persons, in a position above him; others by some one on a level with him. The ground, however, where the body was found, only indicated, on examination next morning, a struggle between two men. The tracks of five horses were also found the next morning in and near the Newtonia road, and apparently in the same direction and locality from which the noise of the talking of a crowd was heard to proceed after the shooting, and after the noise of horses' feet was heard going south on the previous night. The testimony of Bridges shows that after Marshall had reached Heilig's house, and been invited in—Bridges on his way home, about 150 yards north of Heilig's house, on the Newtonia road, met Benton Davis and six others going south on that road, and after he had gone half a mile he heard several shots behind him.

The testimony of Lisles (who lives on the Newtonia road on Shannon creek, about a mile north of Heilig's house, and close by the spot where that road continues south, and the road to Harmony church forks to the right, and that to Independence school house to the left), shows that about dusk on the evening of the homicide, Marshall passed his house riding south at a pretty good gait, and soon after that, other persons not recognized, came riding along going also at a similar pace and in the same direction and making a noise; that after this party of unknown persons had passed his house and reached the forks of the road before-mentioned, some one cried out, "That is not

the right road, Tom," when some one answered, "D—n the right road to h—ll, this is the road I am going;" and the party, thereupon, took the same road Marshall had gone; that soon after these words were spoken, a pistol shot was fired, and some one was heard to say, "Did you get him?" and another one replied, "Not yet." There was also testimony showing that the party with whom defendants were, was repeatedly seen brandishing and firing pistols on their way from Newtonia; that a pistol shot was fired by some one of the party when in the vicinity of Shannon creek or Lisles' house, where Marshall left them, and when he was about 125 yards in advance of the party on his way to Heilig's house.

As to the difficulty which immediately preceded the homicide of Marshall, the testimony tended to show that on the latter coming out to where the party of young men were he asked some question, received rather a saucy answer from Hale; that some rough words passed between them; that Hale was next seen down from his horse; that Marshall immediately collared or throttled Hale, saying to him, "I'll settle with you," and led him off on the road towards Newtonia; that defendants were seen down off their horses, and as well as one or two others of the party, were also trying to preserve peace by calling to Hale and Marshall for that purpose; that this intercession accomplished nothing; that no one, so far as seen, followed Hale and Marshall; that after they had gone some thirty yards on the road towards Newtonia, Davis and Curry started on eastward from Heilig's towards their homes, and had gone about 100 yards when they heard firing; that Pearson, who lived but a short distance north-easterly from defendants, and on or near the Newtonia road leading towards the home of defendants' father, had, after the altercation between Marshall and Hale begun, gone on south on that road about thirty yards, when he heard a pistol fire, and saw its flash; that when he had gone about 200 yards from the scene of the altercation he was over-taken by the

39—68

three Swain brothers, who went along with him on the Newtonia road until they came to a point where they left him and turned off in the direction of their home, which, by a near cut sometimes traveled, could be reached by leaving the Newtonia road near the south-east corner of Heilig's little field, thence going south-west through Hale's father's farm and by his house.

The testimony of the three Swain brothers was not inconsistent with that of the other witnesses, but in many particulars is corroborated thereby. They testify to defendants having vainly endeavored to stop the quarrel; that Hale, on being collared by Marshall, had drawn his pistol, and had it drawn by his side; that Marshall had his right hand back on his hip; that no weapon was seen in Marshall's hands; that Marshall and Hale were some seventy-five yards down the road when defendants got on their horses and the firing commenced; that they rode on, overtook Pearson, as he had stated, left him at the corner of Heilig's field, went on towards their home, and when letting down the fence at Hale's father's house, were overtaken by Hale, who said, "He had killed Marshall, the d—d son of a b—h;" that they rode on home, went to bed, where they remained, until under the advice of a neighbor, who had learned that Marshall's brothers were coming to kill them, they went to Col. Freeman's and remained till next day, when they returned home. It was also in evidence by other witnesses, that Hale had marks on his throat, as if he had been throttled by some one; that he made a similar declaration to the one attributed to him about Marshall, that he would have to leave the country or be hung, and that he had left the country. The above is believed to be a correct resume of a voluminous mass of testimony, in the investigation of which, we have been not greatly aided either by the abstract furnished or by the imperfect index to the record.

I. Objection was made to the admission of Lisle's testimony as to the remarks made by some unknown per-

1. RES GESTAE.    sons, and the firing of a pistol at the forks of the road and near his house, just after Marshall had passed. As to who those persons were, is, we think, sufficiently shown to go to the jury. A point of more difficulty is, whether these acts and declarations, and others of a kindred nature, were competent evidence, as part of the *res gestae;* the defendants insisting they are not. In reference to this matter Mr. Greenleaf observes : " There are other declarations which are admitted as original evidence, being distinguished from hearsay by their connection with the principal fact under investigation. The affairs of men consist of a complication of circumstances, so intimately interwoven as to be hardly separable from each other. Each owes its birth to some preceding circumstance, and in its turn becomes the prolific parent of others; and each, during its existence, has its inseparable attributes and its kindred facts, materially affecting its character, and essential to be known in order to a right understanding of its nature. These surrounding circumstances, constituting part of the *res gestae,* may always be shown to the jury, along with the principal fact; and their admissibility is determined by the judge, according to the degree of their relation to that fact, and in the exercise of his sound discretion; it being extremely difficult, if not impossible, to bring this class of cases within the limits of a more particular description. The principal points of attention are, whether the circumstances and declarations offered in proof were contemporaneous with the main fact under consideration, and whether they were so connected with it as to illustrate its character," and he cites the familiar instance of the admission in evidence of the cry of the mob who accompanied Lord George Gordon on his enterprise, as being part of the *res gestae,* and as showing the character of the principal fact. 1 Greenl. Ev., § 108. The evidence offered in the *Commonwealth v. Harwood,* 4 Gray 41, as to conversations of men after coming out of a house, and not in the presence of the owner or any of its inmates, re-

specting what had taken place in the house, was held inadmissible to show the house to be one of ill-fame.   So in *Davenport's case*, also cited for defendants, 2 Allen 299, evidence of what was said and done by disturbers of the peace in a highway at a considerable distance from a certain house on going to and returning from that house, and not in the presence of the defendant or any of his family, was held inadmissible to show the house a disorderly one. Nor was there any connection shown between the principal acts done and the declarations offered in evidence, in *Merchants Bank v. Berthold*, 45 Mo. 527, and held inadmissible.

In the case at bar, had the shot spoken of by Lisle been fired at the time Marshall and Hale were going up the road in front of Heilig's house, and immediately afterward such question and reply were asked and made as took place at Lisle's, the obvious contemporaneousness and connection between the act done and the words spoken would have been too apparent to have been doubted for a moment that such act and words formed part of the *res gestae*, and would, therefore, have been admissible in evidence.   Here, however, at least three-quarters of an hour elapsed between the time the party passed by Lisle's and that when the shots were fired which resulted in Marshall's death. We are, therefore, unable to see any connection in point of time between Marshall's death and the acts and declarations occurring prior to the time the party rode up in front of Heilig's house ; hence, we hold evidence of such acts and declarations inadmissible, if offered as part and parcel of the homicidal transaction on the ground of relating to the main fact, and of being contemporary therewith.   In other words, the principal fact was the killing of Marshall, and we do not conceive that the acts and declarations occurring at Lisle's, or prior to that time, so illustrate and characterize the main fact, as to constitute the whole matter one transaction, and render the admission of the prior occurrences necessary in order to exhibit that fact in its

true light, and give to it its appropriate effect. *Beaver v. Taylor*, 1. Wall. 637.

II. But, though such evidence of other acts and declarations was not receivable as part of the *res gestae*, yet it might be received against those making such declarations and doing such acts, and against those, also, who were associated with them in a common design to effect the death of Marshall. Such evidence, however, would not be admissible except on that ground. Usually, a *prima facie* case as to such conspiracy must be first made out, before the declarations or acts of the co-conspirators are admissible against one another. But the practice also prevails both in England and this country, to admit general evidence of a conspiracy to effect an unlawful act, as preliminary to the proof that the defendants were guilty participators therein. 3 Greenl. Ev., § 92. Such evidence will, in most instances from the very nature of the case, be circumstantial; and, therefore, evidence of an infinite variety of circumstances, trivial and unimportant in and of themselves, when singly considered, may be received to establish with more or less directness, the formation and object of the guilty purpose. But if such general evidence of conspiracy be first introduced, without taking the usual preliminary step of showing the defendants guilty participants therein, and it should manifestly appear insufficient to affect the defendants, it would be the plain duty of the court to stop the cause *in limine*. 3 Greenl. Ev., Ib.

It is far from clear to my mind that any combination or conspiracy was formed between the defendants and Hale to kill Marshall; no old feud grudge or quarrel appears to have existed between the parties; Marshall rode with them in a perfectly friendly manner for two and a half miles, within an hour before he was shot, and was evidently without the slightest apprehension, as shown by his expression to Mary Heilig when going out to meet the party of young men in front of Heilig's house. On the contrary, his sad death seems to have been the result of a sudden quarrel

with Hale, assisted, it may be, by the defendants, and the fact that the evidence tended to show that one of the defendants had purchased a box of cartridges for his pistol, in his possession that day, and that balls corresponding to the size of that pistol were found in the body of the deceased, and that balls apparently corresponding to the size of the pistol carried by Hale, were also found in the body, might well go to the jury along with kindred facts as tending to establish the guilt of the defendants, whether there was any conspiracy to effect Marshall's death established or not.

Of course, if there was a conspiracy between Hale and the defendants to kill Marshall, and it was effected by them, this would, being deliberately and premeditatedly done, be murder in the first degree. But inasmuch as defendants have, by the verdict of the jury, been acquitted of that crime, and as on the return of this cause to the circuit court, they can be tried for no higher grade of murder than that of which they stand convicted, it of necessity follows that any evidence of a conspiracy on the part of defendants to kill Marshall, cannot then be received ; for this would be to ignore the salient feature of murder in the second degree, that it possesses no element of premeditation or deliberation ; that it stands on the same footing in this regard as manslaughter at common law ; both offenses being considered in law sudden and unpremeditated. 3 Greenl. Ev., § 43. But notwithstanding no conspiracy to effect the death of Marshall can be shown against these defendants on a second trial of this cause, yet evidence tending to show a conspiracy to effect his great bodily harm may well be admitted against them ; and if, in the endeavor to effect such unlawful design, they accomplished his death, they would be guilty of murder in the first degree. This point was thus ruled in the *State v. Jennings*, 18 Mo. 435. Inasmuch, however, as they stand forever acquit of that higher grade of offense, they cannot be convicted of more than murder in the second degree, even if

the jury find that they, in the accomplishment of the unlawful design of inflicting great bodily harm, effected the death of the deceased.

III. We think the instruction asked by the defendants in reference to good character, or a similar instruction, should have been given; they had abundantly established a good character as peaceable, law-abiding citizens anterior to the commission of the offense with which they are charged; and evidence of facts and evidence of character rest on the same basis; and no legitimate distinction can be taken between them. The object of the introduction of evidence respecting good character, is the improbability that a person of good character would have committed the offense alleged against him, and to lay such evidence before them with the purpose of inducing belief that either mistake or misrepresentation has occurred on the part of the prosecution. 3 Greenl. Ev., § 25, and cases cited; *State v. Alexander*, 66 Mo. 148.

IV. The case of the *State v. Miller*, 67 Mo. 604, is conclusive of the point as to the admissibility of Archer's testimony in contradiction of the witness Curry, the statement of whose testimony was received under the provisions of the act of 1875. But, though Archer was properly permitted under that act to swear that Curry had made a statement contradictory of the one accepted as the one he would make if he had been present at the trial, yet the jury ought to have been far more explicitly told than they were that such testimony could only be received for the sole purpose of impeaching Curry's statement, and could, under no circumstances, be received as evidence against the accused. The statutory method of impeaching the testimony of an absent witness is sometimes very harsh in its practical operation, and should in consequence, be very sedulously guarded by the trial courts. The statement made in behalf of the absent witness, Curry, was similar to the testimony of the other witnesses, Davis and Pearson. None of the witnesses had testified that Thos Swain had

a revolver in his hand, and going up to Marshall and Hale when they were clinched and going up the road; but Archer, in order to impeach Curry's expected statement, was allowed to testify that Curry had made a statement to him to that effect.

The jury should have been very pointedly told that the testimony of Archer, so far as being evidence against the defendants, was to be entirely excluded from their consideration; that its only purpose was to impeach the statement of Curry, and could have no other effect whatsoever. The instruction asked by defendants on this point was altogether unobjectionable, and should have been given. It is by no means improbable that Archer's testimony had no little weight in turning the scale against the accused; and this illustrates, in a very forcible manner, the extreme danger of overthrowing, by legislative innovations, well established rules of evidence.

V. Relative to the testimony of defendants themselves, we do not think that the instruction asked for them on that point should have been given. But we do think that the jury should have been told that a defendant, testifying in his own behalf in a criminal case, has as much credibility attached to his testimony as if testifying in a similar manner in a civil one. 2 Wag. Stat., § 1, p. 1372; Laws 1877, p. 356, § 1.

VI. We see no good reason why the usual formula as to a reasonable doubt should have been changed by receiving the addition of the word "captious." It is better to adhere to well settled instructions than to attempt new departures and experiments in criminal procedure. The judgment is reversed and the cause remanded. All concur except HENRY, J., not sitting, and NAPTON, J., dissenting.

REVERSED.