The State v. McNamara.

THE STATE v. McNAMARA, *Appellant.*

1. **Criminal Law** : INDICTMENT : PRACTICE. It is no objection to an indictment, or the proceedings had under it, that it was presented upon one day and by order of court . sent back to the grand jury for the purpose of having the names of the witnesses indorsed upon it and returned and filed on the following day.

2. —— : PRACTICE : BILL OF EXCEPTIONS. A bill of exceptions filed in vacation, within the time allowed by an order of court entered of record during the term, constitutes a part of the record for review in the appellate court.

3. —— : ASSAULT WITH INTENT TO KILL : INSTRUCTIONS. Instructions for assault with intent to kill, under Revised Statutes, 1879, section 1263, are not objectionable which in substance declare that, if the defendant did the act alleged in the heat of passion with intent to kill, he is guilty unless it was done under such circumstances as to be justifiable on the ground of self-defense, and which require the jury to find all the facts constituting the offense beyond a reasonable doubt.

4. —— : REASONABLE DOUBT : GOOD CHARACTER : INSTRUCTION. An acquittal cannot be authorized in a criminal cause upon any kind of doubt short of a reasonable doubt, and an instruction declaring that any doubt supplemented by proof of good character would authorize an acquittal is erroneous.

5. —— : GOOD CHARACTER : INSTRUCTION. Where a defendant in a criminal cause asks a proper instruction on the subject of good character it may be given; but if he asks an improper one it must be refused and he will not be heard to complain that the court did not of its own motion give a correct instruction on the subject.

6. —— : —— : ——. The requirement that the court declare the law applicable to the case, whether proper instructions are asked or not, does not include such merely collateral matters as the good character of the defendant.

7. —— : —— : REMARKS OF PROSECUTING COUNSEL. Remarks of prosecuting counsel in this case *held* not to constitute such misrepresentation of the law as to the weight to be given to evidence of good character as called for the interference of the trial judge, or to warrant a reversal because of his failure to interfere.

8.    ———: IMPEACHMENT OF VERDICT: AFFIDAVIT OF JUROR. The
affidavit of a juror will not be received to impeach his own
verdict.

9.    ——— : VERDICT. The word "pertentiary" for "penitentiary" in
the verdict of a jury constitutes no ground for reversal. [SHER-
WOOD, J., *dissenting.*]

*Appeal from Montgomery Circuit Court.*—HON. E. M.
HUGHES, Judge.

AFFIRMED.

*John M. Barker, Barker & Shackelford* and *Silver
& Brown* for appellant.

(1) The court erred in allowing the indictment
withdrawn, amended and changed. R. S. 1879, sec.
1798. (2) The instructions given by the court were
erroneous in that they assumed that Geo. Woods did
not attack the defendant, but merely restrained him
and also assumed that defendant was in the act of com-
mitting a felonious assault upon some other person.
*Peck v. Ritchey,* 66 Mo. 114; *Russell v. Minteer,* 83 Ill.
150; *Boddie v. State,* 52 Ala. 395; *Snyder v. State,* 59
Ind. 105; *State v. Wheeler,* 79 Mo. 366. (3) The court
erred in not giving an instruction as to the consideration
of defendant's good character. The evidence of
defendant's good character was uncontradicted. Such
evidence is always relevant, and is material in all
criminal cases. It is an item of proof to be considered
by the jury. Whar. Crim. Ev. [9 Ed.] secs. 65, 67;
*State v. McMurphy,* 52 Mo. 251; *State v. Alexander,* 66
Mo. 148; *State v. Underwood,* 76 Mo. 630; *State v.
McNally,* 87 Mo. 644. When defendant in a criminal
case has given evidence tending to establish his good
character, he is entitled to have the jury instructed as to
its effect. *State v. Swain,* 68 Mo. 605. If it be conceded
that it was defendant's duty to ask an instruction on
this branch of the case, and that his first instruction on

this subject was erroneous and properly refused, still it was the duty of the court to give a correct instruction on this subject, and it committed reversible error in allowing the case to go to the jury without so doing. *State v. Mathews*, 20 Mo. 55; *State v. Kilgore*, 70 Mo. 546; *State v. Maxwell*, 92 Mo. 542; *State v. Jones*, 61 Mo. 232; *State v. Stonum*, 62 Mo. 596; *State v. Lowe*, 93 Mo. 547.   (4)   The remarks of assistant counsel for the state that evidence of good character could do defendant no good, and that the only object of admitting such evidence was to show that defendant did not do the act charged, was gross error, especially in consideration of the fact that defendant was deprived of proper instructions on the subject of character, and that this mis-statement of the law was allowed to go unchallenged by the court, although objection was made by defendant's counsel at the time.   It is not the duty of prosecuting attorneys to declare the law to the jury.   And where they make, in argument, gross mis-representations of the law, which are allowed to go unrebuked by the court, it is such error as demands a reversal of the judgment.   *State v. Mahly*, 68 Mo. 315; *State v. Reed*, 71 Mo. 200; *State v. Jackson*, 95 Mo. 653; *State v. Martin*, 74 Mo. 547

*John M. Wood*, Attorney General, for the State

(1)   Neither the evidence nor the instructions can be noticed for the reason that they have not been preserved by a bill of exceptions.   *State v. Broderick*, 70 Mo. 622; *State v. Duckworth*, 68 Mo. 156.   (2)   The instruction complained of does not assume, as stated by appellant, that defendant was being restrained by George Woods at the time of the shooting, but leaves the whole question to be determined by the jury. (3) It has been decided by this court that while it is the "duty of the court to declare the law applicable to

every crime or grade of crime of which, under the evidence, the jury might convict the accused, as to collateral matters, it is for the respective parties to ask such instructions as they may be entitled to.'' If they are required to ask instructions, it is contemplated that they are to ask correct ones. The instruction as to the defendant's character, which was refused, was clearly erroneous, and, being upon a collateral matter, the court committed no error by a failure to give a proper instruction. *State v. Brooks*, 92 Mo. 542, and cases cited. (4) A juryman cannot be allowed to impeach his verdict by saying it was rendered under a mistaken view of the law or facts several months after it was rendered. There was no ground stated in the motion for a new trial to which juror Owen's affidavit could apply; his mistake, if any, was not alleged as one of the reasons for asking a new trial. (5) The remarks of counsel in his concluding argument for the state were not such as to justify a reversal. He had a right to comment upon all the evidence in the cause, and to draw conclusions therefrom. *State v. Emory*, 79 Mo. 461; *State v. Zumbunson*, 86 Mo. 111; *State v. Griffin*, 87 Mo. 608; *State v. Hoffman*, 78 Mo. 256; *State v. Stark*, 72 Mo. 37; *State v. Hopper*, 71 Mo. 433.

BRACE, J.—At the April term, 1887, of the circuit court of Montgomery county, the defendant was indicted under section 1262, Revised Statutes, 1879, for shooting at one George W. Woods, '' on purpose and with malice aforethought,'' with a loaded pistol with intent to kill, and at the same term was found guilty of assault with intent to kill under section 1263, and his punishment assessed at imprisonment in the penitentiary for two years. From the sentence and judgment on the verdict he appeals.

The shooting took place at a school meeting in the district on the fifth of April, 1887, when an election

was being held for school directors. Two ballots had been taken, which had resulted in a tie, and the third was progressing when a young man by the name of Rodgers going to vote, his vote was challenged by John Woods, a brother of George, whereupon an angry altercation ensued between them, and John Woods rushed toward Rodgers, followed by his brother Alexander, who was near him when the altercation commenced; while these two brothers were bearing down on Rodgers and running probably in a general direction toward the place where the defendant was, he drew his pistol, a revolver, from his hip pocket, brought it round to the front of his person with his right hand, caught it with his left, raised it facing in the direction of the Woods brothers, when George Woods, who was in the rear of the defendant, and near him, came up behind him, threw his arms around him, pressing defendant's arms to his side. The defendant, by struggling, got his right arm loose from George's embrace, raised it, bringing the pistol in his right hand over his left shoulder, and, turning his face in that direction, looked toward George's head and fired, the shot passing through George's cap. The defendant was then thrown to the floor and the revolver taken away from him.

The evidence for the state tended to prove that nothing offensive had been done or said to the defendant by any one before he drew his revolver, and that George Woods had been sitting quietly near him up to the moment when he took hold of the defendant in the manner stated for the purpose of preventing him using it. The defendant testified that he drew his pistol and placed himself in a defensive position, in apprehension of an attack from Alexander Woods, who was approaching him and drawing off his coat, when he received a blow from some one on the back of his head, was immediately thereafter grabbed from behind, tried to look

around, and in the impulse of self-defense threw up the pistol and fired. .

1.   The record shows that the indictment in this cause, which is in every respect a sufficient and formal one, was returned into court and entered on the twenty-sixth of April, 1887. Its validity, or that of the proceedings under it, is in no way affected by the fact that it was presented the day before, but not having the names of the state's witnesses endorsed thereon was not entered, but by order of the court returned to the grand jury for that reason, as the affidavit of the clerk tends to show.

II.   The bill of exceptions was filed in vacation, by leave of court entered of record in term within the time allowed, and is part of the record for review.   Sess. Acts, 1885, p. 214.   But in it we find no specific objections to the admission or rejection of evidence, nor any exceptions properly taken and saved to any ruling of the court thereupon.

III.   The instructions given by the court are, perhaps, obnoxious to some of the verbal criticisms made upon them, but on the whole presented very fairly the issue between the state and the defendant on the offense of which he was found guilty, telling the jury, in substance, that if the defendant in the heat of passion shot at George Woods with the intention of killing him, the defendant was guilty of the offense defined in section 1263, unless such shooting was done under such circumstances as to be justified on the ground of self-defense, and requiring them to find all the necessary facts constituting the offense beyond a reasonable doubt, and to acquit if they had a reasonable doubt on the whole case.

The instruction on self-defense was not erroneous in that the question whether the defendant had reasonable cause to believe that he was in immediate danger was submitted to the jury (*State v. Sloan*, 47 Mo. 604; *State v. Eaton*, 75 Mo. 586; *Nichols v. Winfrey*, 79 Mo.

545), and in other particulars was such as has been approved by this court. *State v. Thomas*, 78 Mo. 327.

IV. The defendant asked four instructions, all of which were refused. The second, third and fourth were upon the ground of self-defense, and, in so far as they stated correct propositions of law applicable to the facts of the case, were as favorably stated for the defendant in the instructions given by the court on that branch of the case as in those asked ; and, for the refusal to give them, he has no just cause of complaint. The first is as follows :

" 1. If the jury from all the evidence in this cause have any doubt of the defendant's guilt, and further believe from the evidence that the defendant has for a long time, and now possesses, a good moral character for peace, sobriety and honesty, then such fact of good character, coupled with the presumption of innocence, which the law invokes, is sufficient upon which to find a verdict of not guilty, and the jury may then acquit the defendant."

The court committed no error in refusing this instruction. The jury had no right to acquit the accused on *any kind of doubt*, short of a reasonable doubt, whether the defendant was a man of good or bad character, and the court had no right to tell the jury that *any* doubt supplemented by proof of good character would authorize them to acquit. It was for the jury to determine, taking into consideration the evidence of defendant's good character in connection with all the other evidence in the case, whether there was such a reasonable doubt of his guilt as to authorize an acquittal. It is contended, however, that conceding that the court committed no error in refusing the instruction in the form asked, yet the defendant having given evidence tending to establish his good character, it was the duty of the court to give a correct instruction on the subject ; and that the court committed reversible

error in neglecting to do so. It has been repeatedly held in this state that evidence of good character of defendant in criminal cases is always to be considered by the jury in making up their verdict as to the guilt or innocence of the accused. *State v. McMurphy*, 52 Mo. 251; *State v. Alexander*, 66 Mo. 148; *State v. Underwood*, 76 Mo. 630; *State v. McNally*, 87 Mo. 644. It has also as frequently been held that evidence of good character of the defendant is to be treated the same as any other evidence of fact in the case and " that no legitimate distinction can be taken between them." *State v. Alexander, supra; State v. McNally, supra; State v. Swain*, 68 Mo. 605. If this be so, it is difficult to see on principle why the fact of character should, in any case, be selected from other facts in the case, and made the subject of instructions.

The practice of singling out any single fact and calling the attention of the jury to it, as a subject for their consideration, thus giving it an undue prominence over other facts in the case, would seem to be objectionable. *State v. Hundley*, 46 Mo. 414; *State v. Smith*, 53 Mo. 267. Nevertheless the practice of giving an instruction on the subject of character, when limited to a direction to the jury that the same may be taken into consideration in connection with all the other facts and circumstances in evidence in the case in determining the question of guilt, has frequently received the sanction of this court. Cases *supra*, and *State v. Jones*, 78 Mo. 278; *State v. Vansant*, 80 Mo. 67. But we do not understand any of the cases to go to the extent of holding that the omission of the court to give an instruction upon the subject of character is ground for reversal; the extent to which they can be held to go is, that if the defendant asks for a proper instruction on that subject he may have it given; if it is not a proper one, of course, it must be refused. He has no cause of complaint that thereupon the court gives no instruction upon the subject. The law requiring the court to declare the law

applicable to the case, whether proper instructions are asked for or not, does not comprehend such merely collateral matters. *State v. Brooks*, 92 Mo. 542.

V. The closing argument for the state was made by Judge Elijah Robinson; objections are urged to several remarks made by him in that argument, but the following is the only one properly saved for the consideration of this court, in the bill of exceptions : "The only object of the law in allowing evidence of the defendant's good character is to show that a man did not do the act;—where there is a doubt about the act, only in such cases as these ( here selecting one of the jury as an example ): Suppose you had a horse stolen ( or taken ), and that the horse is afterward found in my possession. I would then have the right to introduce evidence to show my good character in order to rebut the presumption that I had stolen or taken the horse, and evidence of good character cannot do this defendant any good."

Reading this paragraph alone, disconnected from the line of argument in which it was used, some ground may be found for the contention that the jury might have been misled by the expression "did not do the act," coupled as it is in the manner stated in the sentence with the statement, "and evidence of good character cannot do this defendant any good." The formation of the sentence however at once suggests that something must have been omitted, and when read in the light of the affidavit of Judge Robinson that what he actually said was that good character was not an excuse for the commission of crime (illustrating as aforesaid ) and in this case the evidence was clear that McNamara had done the shooting, *and that there was no reasonable cause for him having done it*, the evidence of good character could not excuse him for it, or as stated "cannot do him any good." There will be found no such misrepresentation of law as to the weight

The State v. McNamara.

which should be given to evidence of good character, as would require the interference of the trial judge, or warrant a reversal upon the ground that the judge did not thereupon so interfere.

VI.  The affidavit of juror Owens that he intended by his verdict to find the defendant guilty of carrying concealed weapons, and not of shooting at George Woods, afforded no ground for a new trial; a juror cannot be permitted in this way to impeach his own verdict. *State v. Rush*, 95 Mo. 199, and cases cited. Nor should the judgment be reversed because the jury in their verdict misspelled the word "penitentiary;" the word as spelled in this record looks like "pertentiary," but no one could for a moment mistake the meaning.

Finding no reversible error in the record of the trial of this cause, the judgment is affirmed.

All concur, except SHERWOOD, J., who dissents; BARCLAY, J., concurs in the result.

SHERWOOD, J. (*dissenting*).—The defendant was indicted at the April term, 1887, of the Montgomery county circuit court for an assault with intent to kill one George Woods.  He was tried at the same term and convicted and his punishment assessed at two years' imprisonment in the penitentiary.  He appealed from the judgment of the circuit court to this court.  The indictment was returned to the lower court on the twenty-sixth day of April, 1887, and the trial had at the April adjourned term in June following.  The alleged assault was made on the fifth of April, 1887, at the annual school meeting of the district in which the defendant and George Woods resided.  The defendant was a member of the board of directors and its president.  The father of George Woods, the party charged to have been assaulted, was also a member of the board. The latter's term expired at that time, and two directors

were to be elected at that meeting. Much feeling had been engendered in the district by previous efforts to divide it and to move the schoolhouse site. This feeling had assumed a personal character as between the defendant and the Woods family, father and sons. Other considerations, more purely personal, had caused coolness between the families.

There was a contest at the school meeting over the election of two directors and the opposing interests were known geographically as the northern and southern factions. There was a large attendance at the meeting. One director was elected and two ballots had been taken in an effort to elect the second. During the progress of the third ballot John or Alexander Woods, or both, challenged the vote of one John Rodgers, out of which grew an altercation resulting in an attack upon Rodgers by John Woods, or, as some witnesses say, by both John and Alexander Woods, in which Rodgers was knocked down and severely beaten. During the progress of this fight McNamara, the defendant, drew his pistol. Some witnesses testify that Alexander Woods, during the fight between Rodgers and his brother John, advanced in a threatening manner toward the defendant, taking off his coat as he went toward him. Others say that he proceeded in the direction of the defendant, but was in reality following his brother, who was bearing Rodgers back and past the defendant, whilst still other testimony is to the effect that he advanced upon McNamara and, upon the latter drawing his pistol, he turned away and joined his brother John in his assault upon Rodgers. *The witnesses uniformly agree that defendant made no effort to use his pistol, but stood holding it in his hand.*

At this juncture the witnesses all concur in stating that George Woods approached the defendant from behind and clasped his arms around the defendant, pinioning the latter's arms to his side. The defendant

struggled until he succeeded in freeing one hand, and, turning partially around, he fired over his shoulder at his assailant, the bullet passing through the latter's cap, but doing him no injury. No witness saw George Woods strike the defendant before the shot was fired. But no one denies that he might have done so. One witness testifies that when the shot was fired he saw blood trickling down the back of the defendant's head, and it is not disputed that there was blood on the back of his head at the close of the difficulty, and blood on the floor and bench where he was standing when assaulted by George Woods, and that an ugly wound had been made on the back of his head by some instrument. One witness says it was a gash which could have been made with a knife. The defendant himself testifies that he received a blow or cut from some one before he was caught from behind. He did not know who held him. He believed it was Geo. Woods. He tried to look around and, in the impulse of self-preservation, he fired the shot. And the testimony of the defendant discloses ample ground for being armed with the pistol; but whether he had such ground or not is immaterial, unless he were indicted for carrying concealed weapons. The evidence shows that defendant, after firing the shot, was borne to the floor by Geo. Woods, his pistol was taken from him by the latter and he and his brother Alex. beat the defendant into a dazed condition. Their father made them desist, and himself assisted the defendant to rise from the floor.

After these two simultaneous difficulties had ceased, George Woods, not satisfied with the punishment he and his brother Alex. had inflicted upon McNamara, and the beating that his brother John had given Rodgers, himself became involved in an altercation with Rodgers. Each called the other a coward, and there is evidence that Woods advanced upon Rodgers when the latter fired upon him, giving him a mortal

wound, from which he died in a few minutes. There was no connection between McNamara and Rodgers, and neither of them had anything to do with the difficulty between the other and the Woods brothers, further than that Rodgers was voting with what was called by some witnesses the McNamara faction. Alexander Woods was very active in canvassing the district for some time before the meeting, and on the day before told the witness Thorley that if McNamara *"did not drive a little slow there to-morrow, there might be a little fun."*

The defendant testified that he saw Rodgers challenged and knocked down, and Alex. Woods pulling off his coat and advancing toward him (defendant) when he drew his pistol and stood on the defensive, making no offensive demonstration. He was then struck from behind and clasped around the arms, when he fired back over his shoulder. While Alex. Woods denies making any demonstrations against McNamara and denies that he struck or beat him after he was knocked down by Geo. Woods, and the other evidence for the state generally tends *negatively* to show that neither of the Woods brothers made any demonstration against the defendant previous to the firing of the shot by the latter, witnesses for the defense testify positively that Alex. was advancing threateningly upon McNamara when the latter drew his pistol, apparently for the purpose of stopping the advance of Woods. It was shown that Alex. Woods was a man of medium size; George would weigh one hundred and seventy-five or one hundred and eighty pounds, and John two hundred and forty or two hundred and fifty pounds, while McNamara, the defendant, was under the medium size, a little and an old man. Geo. Woods was about nineteen years of age, and not a voter at the school meeting.

A number of witnesses testified to the good character of the defendant, which was not controverted.

The court refused the following instruction upon the subject of good character asked by defendant:

"If the jury from all the evidence in this case have any doubt of defendant's guilt, and further believe from the evidence that the defendant has for a long time, and now possesses, a good moral character for peace, sobriety and honesty, then such fact of good character coupled with the presumption of innocence which the law invokes is sufficient upon which to find a verdict of not guilty, and the jury may then acquit the defendant." No instruction upon the subject of good character was given.

The defendant in support of his motion for new trial filed the affidavit of Wm. E. Owens, one of the jurors who tried the cause, in which he says that he found the defendant guilty of carrying a concealed weapon to the school meeting, and was induced to do so by the closing argument of Judge Robinson. The state called Owens for the purpose of explaining his affidavit, and at the close of a long and close oral examination and after the whole of the affidavit had been read to him he was asked the following question: "Now you have heard the whole of it read, I wish you would state whether you intended to convict McNamara for carrying concealed weapons to the schoolhouse or not?" He answered: "Yes, sir, I did." The remarks made by counsel for the state will be quoted later on.

I have deemed it proper to make a statement of the testimony in this cause, because I do not regard the statement made in the majority opinion as a full and fair statement of the facts in evidence; and upon that evidence, of course, depends the question of defendant's guilt or innocence, and the question as to whether he was fairly tried. I have given what I deem a correct resumé of that evidence as a basis for the following remarks:

Vol. 100—8

I. The great preponderance of the testimony establishes to my entire satisfaction that Alex. Woods was the aggressor, and brought on the state of affairs which led to the firing of the shot by the defendant. Although the threats made by Alex. Woods on the day before, against the defendant, were not communicated to the latter, yet the fact that they were made was competent and very cogent evidence that Alex. Woods was the aggressor and promoter of the strife, and caused the defendant to draw his pistol for his own protection. The authorities in this state fully sustain the position, as to the competency of such evidence. *State v. Alexander*, 66 Mo. 148, and cases cited; *State v. Downs*, 91 Mo. 19; *State v. McNally*, 87 Mo. 644; *State v. Sloan*, 47 Mo. 604. In the case last cited an approving quotation is made from *Campbell v. People*, 16 Ill. 17, where it is said, touching the inference to be drawn from previous threats as to who the aggressor was, that "if he had made threats against the defendant it would be a reasonable inference that he sought him for the purpose of executing those threats, and thus they would serve to characterize his conduct towards the prisoner at the time of their meeting and of the affray."

And there is sufficient evidence to show that Alex. Woods, the threatener of the defendant, and Geo. Woods, who seized the defendant from behind, were *acting in concert* and were both the aggressors in the assault made on the defendant. It cannot be doubted that Alex. Woods, advancing on the defendant and drawing his coat as he came, was only balked for the moment in his previously expressed purpose to make the defendant "*drive a little slow*" by the latter drawing his pistol and standing in a posture of defense. But he made no attempt to use the pistol, *as all the witnesses agree*, and, therefore, the only conceivable purpose of George Woods, in *slipping up* and "grabbing" McNamara from behind, was to enable

his brother Alex., without danger of personal injury, to have "*a little fun.*" This "*fun*" began by a violent cut or blow which George Woods dealt the defendant on the back of the head at the instant he seized him; and which blow split the defendant's scalp open, and caused the blood to flow freely; a wound of so severe a nature as to be plainly visible at the time of the trial, several months thereafter. That George Woods struck the blow cannot well be questioned, seeing that he and his brothers were the only ones engaged in promoting the disturbance which they themselves set in motion, and seeing further, that ·Geo. Woods was *behind* the defendant, and Alex. was not. And the "*little fun*" went on by the Woods brothers hurling the little old man on the floor, and there brutally beating him almost to the verge of his existence; beating him so unmercifully, *that even their own father interfered and rescued him from the murderous hands of his sons!*

But it is quite immaterial *who* struck the defendant on the back of the head; that he was so struck before he fired the shot, or made any attempt to do so, is abundantly shown by the testimony of a disinterested witness, and by the uncontradicted testimony of the defendant himself. He sees the vote of John Rodgers, who voted with him on the school question, and who had voted three times that morning without objection challenged, and then Rodgers knocked down by John Woods; he sees Alex. Woods, with whom he was not on speaking terms, advancing towards him in an excited and threatening manner, and drawing his coat as he came; then the defendant drew his pistol as he had a right to do, but did not attempt to use it; then he was seized from behind, and struck a violent blow, and then turning his head partially around, and unable to see who had seized him or who was his assailant, in the impulse of self-preservation, he threw up his pistol and

fired the shot for firing which he has been tried, *convicted and branded as a felon.* If these facts, too, do not constitute *a clear and indubitable case of self-defense,* then I must confess my utter ignorance of the meaning of that term. If, in the facts stated, the elements of an abundant and plenary self-defense do not exist, then the sooner all expressions and definitions touching the *"first law of nature"* are eliminated as useless from our legal vocabularies the better.

" When a person apprehends that some one is about to do him great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may safely act upon appearances, and even kill the assailant if that be necessary to avoid the apprehended danger; and the killing will be justifiable, although it may afterward turn out that the appearances were false, and there was, in fact, neither design to do him serious injury nor danger that it would be done. He must decide at his peril upon the force of the circumstances in which he is placed, for that is a matter which will be subject to judicial review. *But he will not act at his peril of making that guilt, if appearances prove false, which would be innocence had they proved true."* *State v. Sloan,* 47 Mo. 604, an indictment for murder in the first degree. In *State v. Palmer,* 88 Mo. 568, also a prosecution for murder in the first degree, where the deceased, *unarmed,* advanced, upon the defendant in a threatening manner, whereupon the defendant threw a weight at, and killed, him with it, this court said : "If the defendant acted in a moment of apparently impending peril, it was not for him to nicely guage the proper *quantum* of force necessary to repel the assault of the deceased." To the same effect are *Nichols v. Winfrey,* 79 Mo. 544; *Morgan v. Durfee,* 69 Mo. 469; *State v. Eaton,* 75 Mo. 591. All our reports speak in the same way on this point, and so do the authorities elsewhere. Besides, it must not be forgotten

that the defendant was a member of the board of school directors, and its president.   He had a right, therefore, to be there, and to maintain order; that school room was for the time being his *dwelling house*, his *domicil*, his office.   2 R. S. 1889, secs. 7978, 7979, 7988.   His duty commanded him to be there, and, therefore, he was in a better plight than an individual in ordinary circumstances requiring self-defense, since he was engaged in a lawful act, and, when unduly assaulted, he only did what the apparent necessity of the case demanded, and whether justifiable or excusable the verdict should have been for him.   *Morgan v. Durfee*, 69 Mo. 469.

I am persuaded that no one with unbiased mind can carefully read this record without being constrained by the *evidence alone* to say that *a great wrong has been done to the defendant.*   What little evidence is to be found which bears against the defendant's innocence is of so slight, inconsequential and negative nature, as to warrant the confident belief that the verdict of the jury was not the result of calm deliberation, but of prejudice, passion or partiality.   And this court uniformly interferes in such circumstances, even in *civil* actions (*Spohn v. Railroad*, 87 Mo. 74; *Whitsett v. Ransom*, 79 Mo. 258; *Baker v. Stonebraker's Adm'r*, 36 Mo. 345; *Price v. Evans*, 49 Mo. 396; *Garrett v. Greenwell*, 92 Mo. 120 ); and in *criminal* causes we have never yet abdicated the right we possess, and the duty we owe the accused to overturn verdicts which are not based upon the corner stone of substantial justice.   *State v. Packwood*, 26 Mo. 340; *State v. Burgdorf*, 53 Mo. 65; *State v. Mansfield*, 41 Mo. 470; *State v. Daubert*, 42 Mo. 238; *State v. Brosius*, 39 Mo. 534; *State v. Jaeger*, 66 Mo. 173; *State v. Castor*, 93 Mo. 242; *State v. Primm*, 98 Mo. 368.

On this branch of the cause, therefore, I am in favor of reversing the judgment and discharging the prisoner; and I cannot but think that, had my associates

scrutinized the evidence more closely, they would have reached the same conclusion.

II.   But there are other  reasons, now to be presented, ample reasons  why the judgment herein should be reversed.   I refer to the refusal of the court properly to instruct the jury, and to improper remarks made on behalf of the state.

The defendant established, by his neighbors, a most excellent character as a quiet, peaceable man; and there was no testimony to the contrary.   This evidence called for an instruction as to the probative force of the good character of the defendant; but. *no instruction at all* was given on the subject, though an instruction on that point was asked by the defendant's counsel.   This instruction was faulty, and was, therefore, properly refused; but it was the plain duty of the trial court, an *improper* instruction having been asked,  to have given a *proper one* on that subject.   The reports of this court with unvarying uniformity announce the doctrine that where an improper instruction is asked on behalf of the defense, upon the facts adduced in evidence, a proper one should be given in its stead.   *State v. Matthews*, 20 Mo. 55; *State v. Jones*, 61 Mo. 232; *State v. Kilgore*, 70 Mo. 546; *State v. Lowe*, 93 Mo. 547; *State v. Christopher Young*, 99 Mo. 666; *State v. Hickam*, 95 Mo. *loc. cit.* 332 (BRACE, J.).

"I cannot, in principle," said Mr. Justice PATTESON, "make any distinction *between evidence of fact and evidence of character*.   The latter is equally laid before the jury, as the former, as being relevant to the question of guilty or not guilty.   The object of laying it before the jury is to induce them to believe, from the improbability that a person of good character should have conducted himself as alleged, that there is some mistake or misrepresentation in the evidence on the part of the prosecution, and it is strictly evidence in the case.   The admissibility of this evidence has sometimes

been restricted to *doubtful* cases; but it is conceived that, if the evidence is at all relevant to the issue, it is not for the judge to decide, before the evidence is all exhibited, whether the case is, in fact, doubtful, or not; nor, indeed, afterwards; the weight of the evidence being a question for the jury alone.  His duty seems to be to leave the jury to decide, upon the whole evidence, whether an individual, whose character was previously unblemished, is, or is not, guilty of the crime of which he is accused."   3 Greenl. Ev., sec. 25; 7 C. & P. 673.

It is said, however, in the majority opinion:   " But we do not understand any of the cases to go to the extent of holding that the omission of the court to give an instruction upon the subject of character is ground for reversal; the extent to which they can be held to go is that, if the defendant asks for an instruction on that subject, if it is not a proper one, of course, it must be refused.   He has no cause of complaint that thereupon the court gives no instruction upon the subject.   The law requiring the court to declare the law applicable to the case, whether proper instructions are asked, or not, does not comprehend such merely collateral matters. *State v. Brooks*, 92 Mo. 542."

This statement is *grossly erroneous* in two particulars and for two reasons:  In *State v. Swain*, 68 Mo. 615, an instruction as to good character had been asked by the defendant but refused by the court, and such refusal, and the failure to give a proper instruction on that subject, *was one of the grounds for reversal in that case* (*q. v.*).   Now if it be the law as asserted by the authorities, and by this court in a number of instances, that evidence of *fact* and evidence of *character* rest upon the same basis ; that there is no distinction to be taken between them ; that the jury, in making up their verdict as to the guilt or innocence of the accused, must consider good character "*just like any other fact in the*

cause" (*State v. McNally*, 87 Mo. 644; *State v. Alexander*, 66 Mo. 148; *State v. Swain, supra*), why is it not as much a reversible error in the trial court to refuse to give a *proper* instruction as to good character where an *improper* one is asked by the defendant, as it is to refuse to give a proper instruction on "*any other fact in the cause?*" And yet this court, as shown by cases already cited, has always ruled and invariably held that the asking of an improper instruction by the accused on the evidence, *i. e., the facts* in the cause, and the failure of the trial court to give a *proper* one, was a conclusive and undebatable ground for reversal. *How* the duty of the trial court to give a *proper* instruction can be set in motion or called forth, by the asking of an *improper* instruction, unless it be the duty of the trial court to give a *proper* instruction *whether asked or not*, as the statute in plain terms provides, I leave this court to determine and settle to their own satisfaction, if they can!

Equally unfortunate and equally unfounded is the concluding portion of the statement already quoted: "The law requiring the court to declare the law applicable to the case, whether proper instructions are asked or not, *does not* comprehend such merely *collateral matters. State v. Brooks*, 92 Mo. 542." In the first place, evidence of good character is not a *collateral matter;*" it is "*just like any other fact in the cause.*" Authorities *supra.* It is *vital*, it is *essential*, it is *material.* How, then, can it be termed "*collateral?*" Its efficacy has been exhibited on many occasions, where but for its presence conviction of the crime charged must have resulted. TALFOURD, J., says: "It is a *petitio principii* to say that evidence as to character is entitled to weight only in *doubtful cases, when really it is to make the case doubtful that such evidence is offered.* In some instance in which *guilt* would otherwise be established *beyond a reasonable doubt,*

*evidence of good character may justly produce an acquittal.*" Cited Whart. Crim.. Ev. [9 Ed.] sec. 67. This view of the subject is well illustrated and expressed in *Heine v. Com.*, 91 Pa. St. 145, where GORDON, J., said:

"Furthermore, the learned judge of the court below committed an error in saying to the jury : 'If a man is guilty, his previous good character has nothing to do with the case; but, if you have doubt as to his guilt, then character steps in and aids in determining that doubt.' The effect of this was to give the evidence of good character no weight whatever, for if the other testimony left, in the minds of the jury, a reasonable doubt of .the defendant's guilt, this, of itself, without more, entitled him to an acquittal. Evidence of good character is not a mere *make-weight* thrown in to assist in the production of a result that would happen at all events, but it is *positive evidence*, and may, *of itself*, by the creation of a *reasonable doubt*, produce an acquittal."

Now, how can testimony of good character, which is "*positive evidence*," which has the power to combat, countervail and overthrow the otherwise conclusive evidence of the prosecution; which may *create* "*of itself*" a *reasonable doubt* and thus "*produce an acquittal*," be deemed a "*merely collateral matter?*" The human mind must change in its whole functions, structure and organization before it can, from such premises, draw or accept such an unwarranted and unfounded conclusion. But the *State v. Brooks*, ("God save the mark!") *only* decides that if *no instruction at all* is asked by the accused on a collateral matter that then there will be no error in failing to give one on such subject; but it *does not* decide that if an *improper* instruction be asked on a collateral matter that the trial court would not commit reversible error in failing to give a *proper* instruction; on the contrary, the clear ruling is the other way, for *Kilgore's*

*case*, 70 Mo. 546, is cited and quoted with approbation where it is said:— "*If it* (the instruction) *had been asked, in this case, it should have been given, or if one, objectionable in its phraseology had been asked and refused, the court should have given a proper instruction on the subject!*" So that even the *Brooks case* is no authority in support of the majority opinion here; but is directly against it, conceding for the nonce that evidence of good character is a "*collateral matter*," which, as already demonstrated, it is not, nor indeed can be.

III.    Having successfully shown that the trial court erred in failing properly to instruct the jury as to the good character of the defendant, and the effect thereof, I now turn my attention to other errors. In his closing argument for the state Judge Robinson said : "The only object of the law in. allowing evidence of the defendant's good character is to show that a man *did not do the act.* Where there is a *doubt* about the act, only in such cases as these (here selecting one of the jury as an example): Suppose you had a horse stolen (or taken), and that the horse is afterwards found in my possession, I would then have the right to introduce evidence to show my good character in order to rebut the presumption that I had taken or stolen the horse, *and evidence of good character cannot do this defendant any good.*" During which argument counselor John M. Barker, for defendant, to the court objected to counselor Robinson as stating the law of the case to the jury, and asked the court to intercede its authority in that behalf for defendant, which request was unheeded, and counselor Robinson was directed by the court to proceed with his argument, to which action of the court the defendant's counsel excepted at the time. Whereupon he continued, saying: "I think I understand the law as well as Mr. Barker."

The affidavits or oral testimony in respect to such remarks cannot be heard to countervail what the bill of

exceptions recites as true or to act as a substitute there-for (*State v. Hayes*, 81 Mo. 574), and I will not, there-fore, consider them.

Judge Robinson had recently been judge of that court, and, of course, *"spoke as one having authority,"* and was doubtless listened to by the jury with a degree of attention proportionate to his former judicial posi-tion.   His remarks must, therefore, have had great weight in swaying the minds of the jury; but, unfortu-nately for the cause of *law* and of *justice*, his remarks were only too well calculated to sway the minds of the jury in the wrong direction, and no doubt did so.  From the quotations already made heretofore from the author-ities, it will be readily perceived that those remarks, as to the effect of evidence of good character, *were not law;* and that the only effect of them was to deceive and mislead the jury, and cause them to regard the evidence of the good character of the defendant as *incapable of doing him any good*, so long as it *was clear who fired the shot*.   But, of course, this left out of view the *intent* with which, and the circumstances in which, the shot was fired, and allowed the fact of a previously blameless life to have no weight with the jury, and to go for nothing.   And the trial court, instead of interposing its authority upon objection taken to such unwarranted remarks, not only refused to do so, but told Judge Robinson *to proceed*.   This was equivalent to sanction-ing the grievous error into which counsel had fallen, and thus *duplicated* the error which the trial court had already committed, of failing to give a proper instruction as to good character.   *State v. Rothschild*, 68 Mo. 52; *State v. Jaeger*, 66 Mo. 173; *State v. Martin*, 74 Mo. 547.

This court has so often condemned the failure of trial courts properly to instruct the jury, and of the attempts made by prosecuting counsel to supplement such failure by instructions of their own, framed in the heat of argument, and contrary to law when addressing

the jury, that it is only deemed necessary to cite some of those cases, where the judgments of conviction were reversed, because of such like and other improper remarks. *State v. Reed*, 71 Mo. 200; *State v. Mahly*, 68 Mo. 315; *State v. Lee*, 66 Mo. 165; *State v. Kring*, 64 Mo. 591; *State v. Jackson*, 95 Mo. 623; *State v. Young*, 99 Mo. 666.

IV.   Under our repeated rulings, the affidavit or the testimony of William E. Owen was, of course, incompetent to impeach his verdict; but, though incompetent for this purpose, yet it may serve to show how widely the jury were led astray by the closing argument for the prosecution.   This, however, is a matter which might prove worthy of consideration by another department of the government.   And, on rising from a perusal of this record, I am profoundly impressed with the idea that, if by reason of blunders committed by the trial court, and blunders affirmed by this court, whereby rank and palpable injustice has been done an *innocent man*, executive clemency should ever interpose its beneficent hand in his behalf, it is in this case.   I, therefore, dissent *in toto* from the majority opinion.