THE STATE v. CLARK, Appellant.

Division Two, November 7, 1898.

1. Indictment: MIXTURE OF NAMES. An indictment for homicide which charges an assault with a pistol against Lizzie Clark, and the shooting and striking "of one Lizzie Hatch," is bad, as the assault and the battery must be alleged to have been made on the same person.

2. ———: SHOOTING AT ONE PERSON, KILLING ANOTHER. Where a person shoots at one person and kills another, malice will be implied as to the latter, and therefore the indictment must allege the assault as made on the person killed.

3. ———: ONE GOOD, ONE BAD COUNT: GENERAL VERDICT. Where an indictment contains one good and one bad count, a general verdict will be held to be founded on the good count.

4. ———: ABANDONMENT OF COUNT. Where the court instructs only on one of two counts in an indictment, the other count will be presumed to have been abandoned.

5. Continuance: ABSENT WITNESS: INSUFFICIENT APPLICATION. An application for a continuance on the ground of absence of witnesses, which does not show that defendant is unable to prove the same facts by other witnesses, or what steps were taken to procure the testimony of the absent ones, or that the testimony is material, or that it can be procured, or that the witness was not absent by the connivance of defendant, or that the application is not made for vexation or delay, as required by Revised Statutes 1889, section 4181, is properly denied.

6. Jury: FINDING OF FACT BY TRIAL JUDGE. A finding of fact by the trial court as to a jury list which was excepted to, being unauthorized, can not be considered in reviewing the question.

7. ———: AFFIDAVITS: BILL OF EXCEPTIONS. Affidavits in support of an exception to a jury list are worthless on review, as such matters should be contained in the bill of exceptions.

8. ———: RECITALS IN RECORD. Matters regarding an exception to a jury list, which are recited in the record instead of being brought up in a bill of exceptions, can not be considered on review.

9. ———: IMMEDIATE SUBSTITUTE FOR CHALLENGED JUROR. Where, after the discovery that in the jury list of the State the name of a juror who had been challenged for cause had been substituted in place of another juror, the mistake is immediately corrected, the error is harmless.

10. Appellate Practice: NO EXCEPTION. Where no exception is saved to a ruling on an objection, the question can not be reviewed.

11. Homicide: WIFE: INSANITY: CASE STATED. Accused, after his wife left him, broke into the house where she was staying, and shot her to death, in accordance with a threat which he had made on the same day. After the act he told a witness that he was not ashamed of what he had done. He remained in hiding for two days, and then escaped to another State. A number of witnesses testified that for several weeks after his wife left him, and before the crime, he had acted strangely, talked disconnectedly, refused to eat, and had become moody and melancholy. Held, that a verdict against defendant on the defense of insanity was proper.

12. **Reasonable Doubt:** FAILURE TO DEFINE. Under Revised Statutes, section 4208, as amended in 1895, providing that "the court must instruct the jury, in writing, upon all questions of law arising in the case which are necessary for their information in giving a verdict; which instructions so given shall include, whenever necessary, the subjects of good character and reasonable doubt; and a failure to so instruct in cases of felony shall be good cause, when the defendant is found guilty, for setting aside the verdict and granting a new trial," it is error to fail to instruct on reasonable doubt, whether such instruction is requested or not.

*Appeal from Jackson Criminal Court.*—HON. JOHN W. WOFFORD, Judge.

REVERSED AND REMANDED.

E. L. SNIDER for appellant.

(1) The indictment in this cause is fatally defective, in that it does not sufficiently charge the defendant with a public offense, nowhere sufficiently connects the defendant with the act complained of, but is vague, indefinite and repugnant. Kelly's Crim. Law, 89; State v. Rector, 126 Mo. 328; State v. Herrell, 97 Mo. 105; State v. Foster, 25 Mo. 324. (2) Defendant's application for a continuance sets out all grounds necessary to entitle him thereto, shows as great diligence in preparing for trial as could be used under the circumstances; it was, therefore, an abuse of the trial court's discretion in refusing it. State v. Lewis, 74 Mo. 223; Alt. v. Grosclose, 61 Mo. App. 404; State v. Maddox, 117 Mo. 667. (3) Defendant's objection to the list of jurors because of alteration should have been sustained, and it was error to permit the State to reinstate a challenged juror and substitute him for one of the twelve selected by both parties to try the case upon receipt of the report that one of that number could not sit. The court should have caused another to be summoned and qualified and granted defendant the usual time before compelling him to complete his challenge or go to trial. State

v. Degonia, 69 Mo. 485; State v. Steeley, 65 Mo. 219; Williams v. State, 39 S. W. Rep. 709; State v. Haines, 15 S. E. Rep. 556; State v. Corley, 20 S. E. Rep. 989; State v. Holmes, 54 Mo. 153. (4) The evidence, facts and circumstances in the case all tend to show that defendant was insane at the time of the homicide. It is uncontradicted, the witnesses unimpeached, but was wholly disregarded by the jury, not considered in arriving at the verdict, and so plainly at variance with the finding that the verdict should have been set aside.on that ground and a new trial granted. State v. Young, 119 Mo. 495. (5) The *quantum* of evidence necessary to justify an acquittal on the ground of insanity is improperly stated in paragraph 4 of the tenth instruction given by the court; a preponderance of evidence in that regard being sufficient. State v. Williamson, 106 Mo. 162; State v. Redeimer, 71 Mo. 173; State v. Baldwin, 12 Mo. 223. (6) The degree of insanity necessary to relieve defendant of responsibility for his wrongful acts is not properly stated elsewhere in the instructions, and defendant's request for number 7, refused, should have been granted, it being sufficient to excuse if the insanity existed with reference to the particular act charged. State v. Williamson, 106 Mo. 162; State v. Redeimer, 71 Mo. 173; State v. Baldwin, 12 Mo. 223. (7) The verdict of the jury is general, and it can not be said whether the same is intended to stand on the first or second count of the indictment, whether it was found that the death of deceased was due to the assault on her charged in the first count or was the result of the assault on Lizzie Williamson, *alias* Clark, as charged in the second count, the evidence showing conclusively that if on the latter a verdict of murder in the first degree would be without support, there being neither malice, premeditation nor deliberation as against Lizzie Williamson, *alias* Clark, shown or attempted to be shown. State v. Harmon, 106 Mo. 635.

EDWARD C. CROW, Attorney-General, SAM B.
JEFFRIES, Assistant Attorney-General, and W. W. GRAVES
for the State.

(1)   The indictment is sufficient. The language used
clearly imputes the crime to the defendant. The cases cited
by the defendant are not in point. State v. Burns, 99 Mo.
471; State v. Stacy, 103 Mo. 11; State v. Turlington, 102
Mo. 642. (2) The defendant's application for continuance
was wholly insufficient in law, and should not have been
granted. It shows no diligence. It fails to show that the
same facts could not be shown by other witnesses within the
reach of the court. It fails to show that defendant believed
the alleged testimony of the absent witnesses was true. In
fact, it fails to show any of the things required by the stat-
utes. R. S. 1889, sec. 4181; State v. Howell, 117 Mo. 307;
State v. Bryant, 93 Mo. 273. (3)   Every presumption will
be made in favor of the trial court's ruling upon an applica-
tion for continuance, and such ruling will not be interfered
with upon appeal, unless the discretion of the trial court has
been unusually and oppressively exercised. State v. Steen,
115 Mo. 474; State v. Marshall, 115 Mo. 383; State v. Car-
ter, 98 Mo. 176; State v. Gamble, 108 Mo. 500.   (4) Under
the third point appellant complains of the fact that the State
was permitted to replace one of its challenged jurors and to
take off one that was sick and had not been challenged. This
question was raised in a motion for new trial and the matter
presented to the court by affidavits. The court made a find-
ing of facts and then gave judgment. From the record it ap-
pears that when the court suggested that the substitution be
made, the defendant made no objection, but acquiesced
therein, but afterward objected on the ground that he had not
had a list of forty-seven qualified jurors to select from, an
objection altogether different from the objection now being
urged. As a matter of fact, and as the court so found, the

defendant did have a list of forty-seven qualified jurors at the time the list was handed to him to make his challenges. The defendant having acquiesced in the suggestion of the court as to the substitution of this juror, as shown by the finding of the court, can not now be heard to complain. (5) The evidence upon the question of insanity is conflicting. No witness testifies that defendant was in a condition of mind not to know the right from the wrong of the action, and the court sustained a point to instruct upon questions of insanity. (6) The instructions given by the trial court upon the question of insanity are proper, and such as have met with the approval of this court. State v. Schaefer, 116 Mo. 97. (7) The evidence in this case shows no such mental condition or stage of insanity, for such previous time and from such cause or causes, and of such character as would justify the court in giving instruction number 4, asked by defendant, and the court's action in refusing same was proper. Defendant's alleged mental condition was of recent origin, and from a temporary cause, and in such case no presumption of continuity follows. State v. Lowe, 93 Mo. 547; Underhill on Crim. Ev. (1898), sec. 156. (8) The crime charged in the second count is as much murder in the first degree as that charged in the first. If defendant made such assault upon Lizzie Williamson, which, if fully consummated as against her, would have been murder in the first degree, and the same assault resulted in the killing of Lizzie Hatch, such killing would be murder in the first degree. State v. Payton, 90 Mo. 220; State v. Montgomery, 91 Mo. 52; State v. Gilmore, 95 Mo. 554. (9) Appellant's objection that the verdict is a general one is untenable. Where the several counts of the indictment all relate to the same transaction a general verdict is good and will support the judgment. State v. Brooks, 92 Mo. 542; State v. Stewart, 90 Mo. 507.

SHERWOOD, J.—The conviction in the case at bar was of murder in the first degree, the indictment as follows:

"The grand jurors for the State of Missouri, in and for the body of the county of Jackson, upon their oath present that Thomas Clark, whose Christian name in full is unknown to these jurors, late of the county aforesaid, on the 5th day of June, 1897, at the county of Jackson, State of Missouri, then and there being, in and upon one Lizzie Hatch, then and there being, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought did make an assault, and with a dangerous and deadly weapon, to wit, a certain revolving pistol then and there loaded with gunpowder and leaden balls, which he, the said Thomas Clark, in both his hands then and there had and held, at and against her, the said Lizzie Hatch, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot off and discharge and with the revolving pistol aforesaid, and the gunpowder and leaden balls aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot and strike her, the said Lizzie Hatch, in and upon the body of her, the said Lizzie Hatch, then and there with the dangerous and deadly weapon, to wit, the revolving pistol aforesaid, and the gunpowder and leaden balls aforesaid, in and upon the body of her, the said Lizzie Hatch, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, then and there and thereby giving to her, the said Lizzie Hatch, one mortal wound, of which said mortal wound, the said Lizzie Hatch then and there instantly died. And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Thomas Clark, her, the said Lizzie Hatch, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought,

State v. Clark.

did kill and murder, against the peace and dignity of the State.

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that said Thomas Clark on the 5th day of June, 1897, at the county of Jackson, and State of Missouri, then and there being, in and upon one Lizzie Williamson, *alias* Lizzie Clark, then and there being, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did make an assault, and with a dangerous and deadly weapon, to wit, a certain revolving pistol, then and there loaded with gunpowder and leaden balls, which he, the said Thomas Clark, in both his hands then and there had and held, at and against her, the said Lizzie Williamson, *alias* Lizzie Clark, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot off and discharge and with the revolving pistol aforesaid and the gunpowder and leaden balls aforesaid, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did shoot and strike one Lizzie Hatch, then and there being on the body of her, the said Lizzie' Hatch' then and there with the dangerous and deadly weapon, to wit, the revolving pistol aforesaid, and the gunpowder and leaden balls aforesaid, in and upon the body of her, the said Lizzie Hatch, then and there and thereby feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, giving to her, the said Lizzie Hatch, one mortal wound, of which said mortal wound, she, the said Lizzie Hatch, then and there instantly died. And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Thomas Clark, her, the said Lizzie Hatch, in the manner and by the means aforesaid, feloniously, willfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did kill and murder, against the peace and dignity of the State."

1. The first count in the indictment is undoubtedly good. As much, however, can not be said of the second. The evidence shows that Lizzie Hatch is the mother, and Lizzie Williamson, *alias* Lizzie Clark, is her daughter.

Now the second count charges an assault with a revolver upon Lizzie Williamson, *alias* Lizzie Clark, then the discharge of the pistol had and held against Lizzie Clark, alias Williamson, then the shooting and striking "of one Lizzie Hatch," etc. *Who* Lizzie Hatch is, whether she is the same person mentioned in the first count, we are not informed. If the words had been, "the said Lizzie Hatch," then under the rulings of this court and elsewhere the reference to the person mentioned in the first count would perhaps have been sufficient. [State v. Wagner, 118 Mo. loc. cit. 629, and cases cited.]

But had the words "the said," etc., been used, the count would still have been insufficient for the reason that as the counts stands the assault is alleged to have been made on one person, to wit, Lizzie Williamson, etc., and the battery done upon another, to wit, Lizzie Hatch. But an assault is always necessary to be charged when a battery occurs in the perpetration of a murder. [Lester v. State, 9 Mo. 658; 2 Bishop, New Crim. Proc., sec. 537; Whart., Hom., sec. 808; 1 Whar., Crim. L. (9 Ed.), sec. 518; 1 Arch. Cr. Proc., 789.] And of course, both the assault and the battery must be alleged to have been made and done on the same person or else there would be a murder perpetrated by means of a battery without an assault having first been made. But an objection still more grave confronts the validity of the count under review, because: "Where the party shoots at one man and kills another, malice will be implied as to the latter; and the felonious intent is transferred, on the same ground, where poison is laid to destroy one person and is taken by another." [3 Chitty, Crim. Law, 729; 1 Hale, P. C., 466.] And where the felonious intent is thus transferred, the indictment must

be drawn accordingly, to wit, it must allege that the assault was made on the party murdered, and so on, in all respects, just as if the party *killed* had been the party *shot at.* So are all the precedents in this State and elsewhere. [State v. Henson, 81 Mo. 384; State v. Payton, 90 Mo. 220; State v. Jump, 90 Mo. 171; State v. Montgomery, 91 Mo. 52; State v. Gilmore, 95 Mo. 554; State v. Pollard, 139 Mo. 220; 1 Hale, P. C. 469-470. See, also, cases cited in note 2 to 9, Am. and Eng. Ency. of Law, 553; Reg. v. Michael, 9 C. & P. 356.] For these reasons the second count must be adjudged bad, and this being the case, the verdict being a general one will be held to be founded on and attached to the first count, that being a good one.

2. But aside from any other consideration the verdict should stand because, first, there was no evidence to support the second count, and because, second, even if there were the court did not instruct on that count and this is tantamount to an election by the State of an abandonment of the second count and a reliance on the first. [Stephens v. State, 36 Tex. Crim. Rep. 386.]

3. The correctness of the denial of the application for a continuance will now be discussed. The defendant was arrested in August, 1897; he pleaded to the indictment on the twenty-seventh day of September, 1897, and on that day the cause was set for trial on December 13, 1897; on the second day of October, 1897, T. A. Spurgeon was appointed as counsel for defendant; on the twenty-ninth of September, 1897, the cause was set down for trial on the seventeenth day of January, 1898. When the counsel was appointed who tried the cause and who now appears in this court on his behalf does not appear, nor does it appear when the first counsel severed his connection with the case. The application shows no diligence whatever; it fails to show that defendant is unable to prove the same facts by other witnesses within reach of the process of the court, nor what steps were used to pro-

cure the testimony of the absent witnesses. One of the letters in regard to defendant's mental condition bears date September 30, 1897, at Chicago. This letter shows that the alleged witness who signed the letter would not swear defendant was insane, and it shows, also, that the whereabouts of that witness must have been known to defendant over six weeks prior to the time the cause was first set down for trial, and yet no attempt is alleged to have been made to take the deposition of the witness nor to procure his attendance, nor that his testimony is material, nor that affiant believes it to be true, nor that it can be procured, nor in what time, nor that the witness is not absent by the connivance, etc., of the defendant, nor that the application is not made for vexation or delay, etc. This application was not filed until January 17, 1898, the very day the cause was set down for trial. It is enough to say of this application that it in no respect complies with the provisions of section 4181, Revised Statutes 1889, nor with any of our numerous rulings upon that section. It was properly denied.

4. Next for discussion is the action of the court in regard to the list of forty-seven jurors from which the panel of twelve jurors was to be selected. The trial court made a formal finding of the facts on this point; but such finding being wholly unauthorized by law, amounts to nothing. Equally worthless are the affidavits on this subject, filed by defendant's counsel and others. We have long since decided, and frequently decided, that affidavits are valueless to supplant, supplement or supply matters which properly belong to the bill of exceptions alone, the sole and proper repository of matters of mere exception. [State v. Hayes, 81 Mo. 574, and many subsequent cases.]

The same rule holds as to attempting to preserve matters of pure exception by recording or reciting them in the record proper; neither court nor clerk can thus *quo warranto* a bill of exceptions and so oust it of its ancient office and customary

functions. [Nichols v. Stephens, 123 Mo. loc. cit. 119; 25 S. W. Rep. 578; and 27 S. W. Rep. 613, and cases cited; Ryan v. Growney, 125 Mo. loc. cit. 480; 28 S. W. Rep. 189, 755; State v. Taylor, 134 Mo. loc. cit. 137; 35 S. W. Rep. 92; State v. Prather, 136 Mo. loc. cit. 25; 37 S. W. Rep. 805; Critchfield v. Linville, 140 Mo. loc. cit. 192; 41 S. W. Rep. 786; State v. Wear, 145 Mo. loc. cit. 204.] The bill of exceptions, so far as concerns the point in hand, is the following:

"After the list of jurors had been given defendant and after both parties had made their challenges and when the jurors selected to try the cause were about to be sworn, the defendant objected to the list because it contains the name of Henry Garth, who had been challenged for cause. Defendant also objects to the list because he is allowed only nineteen challenges according to the list given.

"Defendant objects to the list because the list furnished the attorney for the State is not identically the same as furnished the defendant, in this that in the list furnished the State the name of John E. Williams appears to have been stricken off and the name of Henry Garth who was disqualified, inserted. This mistake was discovered and the name of Henry Garth was stricken off and the name of John E. Williams reinstated.

"Objection overruled by the court. To which action of the court defendant then and there excepted.

"The defendant further objects for the reason that there are only forty-six jurors able to serve on the list furnished the defendant.

"Overruled because it isn't a fact. That the juror W. H. Adams, who is now reported sick, was present in court and well and able to serve when the venire of forty-seven was selected by the court for the trial of this cause, and his name was on the list furnished defendant, and after both the State and defendant had made their challenges, the State struck him off as one of its challenges and reinstated the name of

John Crist who had been challenged by the State when the list was furnished defendant, allowing the defendant twenty challenges, as he is entitled to."

It can not be understood from defendant's first objection above stated, *when* the discovery was made that Garth's name had been substituted for that of Williams. If, as appears to have been the case, the name of Williams was on the list furnished *defendant,* surely he had a valid list on which to make his challenges and the subsequent discovery that the State's list had substituted the name of Garth instead of Williams, could have worked defendant no hurt, as instantly upon the discovery the proper correction was made.

As to the second objection raised by defendant respecting Adams' name, this objection is not before us because no exception was saved to the action of the trial court in this regard.

5. Who Lizzie Williamson was, what relation she sustained to the defendant, whether wife or concubine, does not appear; it does appear, however, that she had left him on some former occasion and was for some time absent. Her absence the second time had only lasted about three weeks. On the afternoon of June 5, 1897, defendant saw Lizzie Hatch and threatened to kill her. He carried his threat into execution that same night, when he visited the locality in another part of the city where she lived, bursted in the door, shot her down in cold blood, went into another room and shot Mrs. Robinson in the leg, breaking the bone, and then on into the kitchen where he shotLizzie Williamson, whom he *loved so well,* then pursued her with bullets as she fled out into the back yard, and when she fell expiring he lovingly caressed her by beating her over the head with the butt of his pistol.

Speaking of that same night, Richard Green, testifying, said: "I know the defendant; on June 5th I saw the defendant after 9 o'clock at night; he was first on the sidewalk in front of my house swearing; he then came into the house and told me that he had killed Lizzie and the old lady; he

said that he just went in and shot through the door; he said there was a clique of them that kept Lizzie harbored and that he had made out to kill the whole clique of them." On being told "you ought not to have done that," defendant replied, "I am sorry I ever saw a gun." Defendant also said to the wife of this witness in reply to her question, that he wasn't afraid or ashamed on account of what he had done. This witness, Green, discloses perhaps the motive which animated defendant's conduct on the fatal occasion.

Defendant, it seems, remained in hiding for some two days in Kansas City and then effected his escape to Chicago, whence he was brought back in August, 1897, as aforesaid.

A witness testified that after defendant's female companion left him, that is some three weeks before the tragedy, he "acted kind of queer" and when asked what was the matter, "motioned to his head and walked off;" that at another time witness met defendant; spoke to him, but he just walked off without saying anything.

Another witness, that he had known defendant about two and one half years, that shortly before the homicide witness "thought that defendant was out of his mind," and as reasons for thinking so he stated that defendant talked about Lizzie Williamson having gone away; that he refused to go on a train to a school picnic on the first of June, because if he did she was going, but wouldn't do so if she were to see him on the train; that he and witness would drive through the country and if he could see her she would come back home; that he thought she had been induced to go away; that he couldn't talk on any subject with any sense; would be talking on one subject and jump off onto another; would begin to talk very sensibly, then would branch off on something else; before this he had talked intelligently.

The brother of defendant testified that shortly before the killing: "He seemed to be crazy; you could not get any

VOL. 147 mo—3

sense out of him; he would talk in a way, then he would change off onto something else; and then he would stop all at once and study along. He was not always this way and it grew worse after his wife left him. He would come to my house and talk to me about his wife; if he only knew where she was he believed he could get her to come back. He said he got so he could not work and he had to get his brother to do his work for him; he would stand around and always complain of his head. I told him there was no use to worry so. When he was a boy about eight years old he fell down a pair of stairs and struck his head, and from that time he was always complaining of his head, and used alcohol on his head all the time. At times he was in such a condition he could not do anything at all and we had to make him stay in the house. He would talk at random, and seemed to completely give up; he acted more strange every day. His condition seemed to grow worse. He would be worse at times when there was something troubling him. It seemed to wear on him for about a week after his wife left him; he was at my house talking to me and running around and said he thought she was in Leavenworth."

Defendant's sister also testified that: "I live at 31st and Cherry streets and am a sister of defendant. Shortly before the killing he was in such a condition that he could not eat; when we would get anything for him, he would take about two mouthsful, and I would say to him, eat your dinner, and he would say that he could not eat. I had to do his work. He would let the fires go out, and I had to do his general janitor work. Sometimes his head would bother him and he would complain of it, and I would get him to lie down. He would talk foolish stuff, and would say 'that Lizzie was happy,' etc.

Q. "You speak of his refusing to eat at times, what would he say?" A. "If Lizzie was here I could eat, or something like that."

Other witnesses testified that they thought defendant insane from his manner and from his becoming excitable after the woman he called his wife had left him and the conversation turned on that subject.

Dr. Logan, for whom defendant worked in 1894, and for whom he had worked as janitor from October, 1895, down to the time of the homicide on June 5, 1897, testified that: "After the first few days, possibly a week or ten days after his wife left him he was very excitable—he had always been very quiet—he was very excitable, running from one place to another hunting her; he finally in the course of a week or ten days quieted down and became moody, melancholy, and I considered seriously the propriety of turning him off."

Q. "From his general conduct from what you saw of him what was your conclusion as to his mental condition as to whether he was sane or demented, insane?" A. "I never examined him as a physician; I was called away from home at the time; I had a brother who had died up in Platte county; I considered his condition such as I was going to turn him off as janitor. I never at that time considered that he was really insane, but I saw that his condition was such that he would become so; he had been very much excited, he never ate or slept—he was very much excited—then he lapsed into a despondent, melancholy condition. For the first ten days after his wife left him he was in a very excited condition; he was running all over the country, was neither eating or sleeping, then he lapsed into a melancholy condition, depressed. He was in a melancholy condition; he would sit with his hands over his face; he didn't attend to his business; I had but little conversation with him, in fact I wasn't much at home then; I was running back from home; he wasn't the same man that he had been."

These extracts from the evidence adduced are sufficient to show what the jury had to consider and pass upon in reference to the question of defendant's sanity at the time of

the occurrence of the homicide. If there was evidence tend-ing to show insanity certainly there was evidence to show sanity. His previous threats followed by their speedy con-summation; the avowal by defendant shortly thereafter that he had done the bloody deed and wasn't ashamed or afraid by reason thereof; his concealment of himself in Kansas City for two days preparatory to his ultimate flight to Chicago, afford ample basis on which to build the rational inference that defendant knew what he was about; knew that he had violated the law, would be punished if caught, and therefore planned and effected his escape and flight to another State. And the instruction on the point of insanity was such as has frequently received approval of this court. See State v. Pagels, 92 Mo. 300, and subsequent cases.

6. Relative to the other instructions given on behalf of the State, speaking in a general way, they followed approved precedents with the exception of instruction number 10, as follows:

"The court instructs the jury that the law presumes the innocence and not the guilt of the defendant and this presumption of innocence attends the defendant throughout the trial and at the end entitles the defendant to an acquittal unless the evidence in the case, when taken as a whole, satisfies you of defendant's guilt beyond a reasonable doubt, as defined in these instructions."

There was no other instruction, however, in which the term reasonable doubt was defined, and so that term was left without definition.

Exception was taken to all of the instructions given for the State.

The duty of the trial court in a criminal case has been made statutory as follows:

"Sec. 4208. *Order of trial.*—The jury being impaneled and sworn, the trial may proceed in the following order: First, the prosecuting attorney must state the case, and offer

the evidence in support of the prosecution; second, the defend-ant or his counsel may then state his defense, and offer evidence in support thereof; third, the parties may then respectively offer rebutting testimony only, unless the court for good reason in furtherance of justice, permit them to offer evidence upon their original case; fourth, the court must instruct the jury, in writing, upon all questions of law arising in the case, which are necessary for their information in giving their verdict [and a failure to so instruct in cases of felony shall be good cause, when the defendant is found guilty, for setting aside the verdict of the jury and granting a new trial] ; fifth, unless the case be submitted without argument, the counsel for the prosecution shall make the opening argument, the counsel for the defendant shall follow, and the counsel for the prosecution shall conclude the argument.    [R. S. 1879, sec, 1908, amended.]"

This section, originally section 1908, was first enacted in 1879, and is found in the revision of that year.    In State v. Brooks, 92 Mo. 542, decided 1887, it was held unnecessary to instruct the jury on an extra-judicial confession unless requested by the defendant so to do.    This ruling I have discussed in State v. Murphy, 118 Mo. loc. cit. 17, and I do not care to go over the subject again, except to say that at the next session of the legislature after that case was decided, the legislature enacted in 1889 an addition to that section, which I have inclosed in brackets, making the failure to instruct on *all* questions, etc., a distinct ground for granting a new trial.    Time passed on, and at the October term, 1889, in State v. McNamara, 100 Mo. 100, it was held in regard to an alleged offense which occurred in 1887, that unless a proper instruction were *asked* on the subject of good character, that the instruction being improper was properly refused, and such improper instruction constituted *no basis* for the trial court to give a correct instruction on the point.    In State v. Murphy, 118 Mo. 7, no instruction whatever on the

subject of good character was asked by defendant, and it was ruled not reversible error to fail to instruct in such circumstances on that matter.    This was at the October term, 1893. At the next legislative session, section 4208, *supra,* received this further amendatory addition, to wit:    "Which instructions so given shall include, whenever necessary, the subjects of good character and reasonable doubt." [Laws of Mo. 1895, 161.]

It would seem that this last amendment should at least include the subjects of "good character and reasonable doubt," whatever may have been heretofore thought of section 4208.

7.    But another reason exists why an instruction should have been given on the subject of reasonable doubt, and this aside from the statutory provisions before noted and that is defendant asked an instruction on that subject, which though faulty, furnished the proper foundation for a correct instruction on the subject, and excepted to its being refused.

This being the case it constituted reversible error for the trial court to refuse upon that footing to give the proper instruction.

This has been the law in this State for a great many years, as witness the following cases:    State v. Matthews. 20 Mo. 55; State v. Jones, 61 Mo. 232; State v. Kilgore, 70 Mo. 546; State v. Lowe, 93 Mo. 547; State v. Hickam, 95 Mo. loc. cit. 332.

*In the face of all these authorities,* the State v. McNamara, *supra,* announces a contrary doctrine, but it should not be followed.

For the single error in failing to give an instruction defining reasonable doubt the judgment must be reversed and the cause remanded.

All concur.